## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JILIN BRIGHT FUTURE CHEMICALS CO., LTD.,<br><br>              Plaintiff,<br>    and<br><br>NINGXIA GUANGHUA CHERISHMET ACTIVATED<br>CARBON CO., LTD. AND DATONG MUNICIPAL<br>YUNGUANG ACTIVATED CARBON CO., LTD.,<br><br>              Plaintiff-Intervenors,<br><br>        v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>    and<br><br>CALGON CARBON CORPORATION<br>AND NORIT AMERICAS, INC.<br><br>              Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge<br>Court No. 22-00336 |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Pursuant to Rule 56.2 of the Rules of the Court, Jilin Bright Future Chemicals Co. Ltd. ("Jilin Bright" or "Plaintiff") hereby moves for judgment on the agency record with respect to its complaint challenging the final results of the U.S. Department of Commerce ("Commerce") antidumping investigation in Certain Activated Carbon From the People's Republic of China, 87 Fed. Reg. 67,671 (Dep't of Commerce November 9, 2022) ("Final Determination"), and accompanying Issues and Decision Memorandum.  The Final Determination covers the period April 1, 2020, through March 31, 2021.

Plaintiff respectfully moves, pursuant to Rule 56.2, for the reasons explained in the accompanying memorandum, for the Court to hold that the contested portions of the <u>Final Determination</u> are unsupported by substantial evidence.  Plaintiff further moves for the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

<div style="margin-left: 40%;">

Respectfully submitted,

<u>/s/ Jonathan M. Freed</u>

Robert G. Gosselink
Jonathan M. Freed
Doris Di
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

</div>

Dated:  May 25, 2023                      *Counsel to Jilin Bright*

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JILIN BRIGHT FUTURE CHEMICALS CO., LTD., | ) |
| | ) |
| Plaintiff, | ) **NON-CONFIDENTIAL** |
| | ) **VERSION** |
| and | ) |
| | ) Business Proprietary Information |
| NINGXIA GUANGHUA CHERISHMET ACTIVATED | ) has been redacted on pages 12-15, |
| CARBON CO., LTD. AND DATONG MUNICIPAL | ) and 17. |
| YUNGUANG ACTIVATED CARBON CO., LTD., | ) |
| | ) |
| Plaintiff-Intervenors, | ) |
| | ) Before: Mark A. Barnett, Chief Judge |
| v. | ) Court No. 22-00336 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| CALGON CARBON CORPORATION | ) |
| AND NORIT AMERICAS, INC. | ) |
| | ) |
| Defendant-Intervenors. | ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFF JILIN BRIGHT FUTURE CHEMICALS CO., LTD.

Robert G. Gosselink
Jonathan M. Freed
Doris Di
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: May 25, 2023          *Counsel to Jilin Bright*

**TABLE OF CONTENTS**

I.     STATEMENT PURSUANT TO RULE 56.2(C) ...........................................................1

  A.   The Administrative Determination Under Review.........................................................1

  B.   Issues Presented ...........................................................................................................1

  C.   Standard of Review.......................................................................................................2

II.    STATEMENT OF THE CASE ....................................................................................4

III.   ARGUMENT................................................................................................................6

  A.   COMMERCE'S DETERMINATION TO VALUE JILIN BRIGHT'S COAL USING
       IMPORT STATISTICS INTO MALAYSIA UNDER HTS 2701.12 RATHER THAN
       MALAYSIAN HTS 2701.19 WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ....6

    1.  Legal Standard for Review of Commerce's Surrogate Value Determinations and
        Background................................................................................................................6

    2.  Analysis ...................................................................................................................9

      a.   HTS 2701.12 is Not Product Specific and Reflects Anomalous Values ....................9
      b.   Commerce's Chosen Formula for Determining the Gross Calorific Value of Jilin
      Bright's Coal Is Not Supported by Substantial Evidence...................................................11

  B.   COMMERCE'S DETERMINATION TO VALUE JILIN BRIGHT'S COAL TAR
       PITCH USING THE AVERAGE UNIT VALUE OF MALAYSIAN IMPORTS OF HTS 2706
       WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE .................................................16

    1.  Additional Factual Background...................................................................................16

    2.  Analysis ...................................................................................................................17

      a.   The UMR Coal Tar Report Provides More Specific Pricing Information Related to
      the Input Being Evaluated Compared to The Malaysian AUV Classified Under HTS 2706
      ..................................................................................................................................17
      b.   The Malaysian AUV Under HTS 2706.00 Is Not the Best Available Information for
      Determining the Value Of Coal Tar Pitch .......................................................................19
      c.   Reliance on the Russian AUV to Value Jilin Bright's Coal Tar Pitch Is Supported by
      Substantial Evidence...................................................................................................23

IV.    CONCLUSION ...........................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) .............2

Timex V.I., Inc. v. United States, 157 F.3d 879 (Fed. Cir. 1998) ...................................................2

Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034 (Fed. Cir. 1996)..................................................2

Mitsubishi Heavy Indus. v. United States, 15 F. Supp. 2d 807 (Ct. Int'l Trade 1998) ...............2, 3

Ceramica Regiomontana, S.A. v. United States, 636 F. Supp. 961 (Ct. Int'l Trade 1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987) .................................................................................................3

Rhone-Poulenc, Inc. United States, 927 F. Supp. 451 (Ct. Int'l Trade 1996) ................................3

Asociacion Colombiana de Exportadores de Flores v. United States, 6 F. Supp. 2d 865 (Ct. Int'l Trade 1998)..................................................................................................................................3

NTN Bearing Corp. v. United States, 74 F.3d 1204 (Fed. Cir. 1995). ...........................................3

Consolo v. Fed. Maritime Comm'n, 383 U.S. 607 (1966) ...............................................................3

Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197 (1938) .........................................3

PAM, S.p.A. v. United States, 582 F.3d 1336 (Fed. Cir. 2009) ......................................................3

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ..............................................3

Nucor Corp. v. United States, 594 F. Supp. 2d 1320 (Ct. Int'l Trade 2008) .................................3

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951)...........................................................3, 10

QVD Food Co. v. United States, 658 F.3d 1318 (Fed. Cir. 2011) ..................................................6

Shakeproof Assembly Components v. United States, 268 F.3d 1376 (Fed. Cir. 2001) .............6, 7

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) ........................................10

**Statutes**

28 U.S.C. § 1581(c).........................................................................................................................2

19 U.S.C. § 1516a(b)(1)(B)(i) .........................................................................................................2

19 U.S.C. § 1677b(c)(1) ...............................................................................................6


**Administrative Determinations**

Certain Activated Carbon From the People's Republic of China, 87 Fed. Reg. 67,671 (Dep't
    Commerce November 9, 2022) and accompanying Issues and Decision Memorandum for the
    Final Results of the 2020-2021 Antidumping Duty Administrative Review (Dep't of
    Commerce November 2, 2022).................................................... 1, 5, 8, 9, 13, 16-18

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 86 Fed. Reg.
    31,282 (Dep't Commerce June 11, 2021)...................................................................4

Certain Activated Carbon From the People's Republic of China: Preliminary Results of
    Antidumping Duty Administrative Review, Preliminary Determination of No Shipments;
    2020–2021, 87 Fed. Reg. 27,094 (Dep't Commerce May 6, 2022) and accompanying Decision
    Memorandum for the Preliminary Results of Antidumping Duty Administrative Review:
    Certain Activated Carbon from the People's Republic of China; 2020-2021 and Surrogate
    Values for the Preliminary Results (Dep't of Commerce Apr. 29, 2022) .....................4, 5, 8, 16

Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Fifth
    New Shipper Review, 75 Fed. Reg. 38,985 (Dep't of Commerce, July 7, 2010) and
    accompanying Issues and Decision Memorandum (Dep't of Commerce July 7, 2010) .............6

## MEMORANDUM IN SUPPORT OF MOTION FOR
## JUDGMENT UPON THE AGENCY RECORD

### I.   STATEMENT PURSUANT TO RULE 56.2(C)

Plaintiff Jilin Bright Future Chemicals Co. Ltd. ("Jilin Bright" or "Plaintiff") submits this

brief in support of its Motion for Judgment upon the Agency Record pursuant to USCIT Rule

56.2.  For the reasons set forth below, Jilin Bright respectfully requests that the Court reverse the

challenged determination of the U.S. Department of Commerce ("Commerce" or the

"Department"), and remand with instructions consistent with this Memorandum and the Court's

findings.

### A.  The Administrative Determination Under Review

This action is an appeal from the U.S. Department of Commerce's ("Commerce") final

results of the fourteenth administrative review in <u>Certain Activated Carbon From the People's</u>

<u>Republic of China</u>, 87 Fed. Reg. 67,671 (Dep't Commerce November 9, 2022) ("<u>Final Results</u>"),

PD 351, and accompanying Issues and Decision Memorandum for the Final Affirmative

Determination in the Issues and Decision Memorandum for the Final Results of the 2020-2021

Antidumping Duty Administrative Review (Dep't of Commerce November 2, 2022), available at

https://access.trade.gov/public/FRNoticesListLayout.aspx (last accessed May 10, 2023), PD 345

("IDM").[1]

### B.  Issues Presented

Plaintiff seeks judgment on the agency record with respect to the following two issues:[2]

---

[1] Throughout this brief, citations to the public record are referenced "PD __" and citations to the
confidential record are referenced "CD __."

[2] Plaintiff has decided not to seek relief with regard to Count Three and Count Four of Plaintiff's
Complaint. <u>See</u> Complaint, Jan. 6, 2023, ECF Doc. No. 9.

1

1. Whether Commerce's determination to value Jilin Bright's coal using import statistics into Malaysia under harmonized tariff schedule ("HTS") classification 2701.12 rather than Malaysian HTS 2701.19 was supported by substantial evidence.
2. Whether Commerce's determination to value Jilin Bright's coal tar pitch using the average unit value of Malaysian imports of HTS 2706 was supported by substantial evidence.

## C. Standard of Review

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  In reviewing final results in antidumping ("AD") duty administrative reviews, the Court holds as unlawful agency determinations that are not supported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  To determine whether Commerce's interpretation and application of the AD statute is "in accordance with law," the Court undertakes the two-step analysis prescribed by <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984).  Under <u>Chevron</u>'s first prong, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue."  <u>Id.</u> at 842.  "To ascertain whether Congress had an intention on the precise question at issue, {the Court} employ{s} the 'traditional tools of statutory construction.'"  <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) .  The first tool is the statute's text; "if the text answers the question, that is the end of the matter."  <u>Id.</u>

If the Court determines that the statute is silent or ambiguous with respect to the specific issue, the Court next examines whether Commerce's construction of the statute is permissible.  <u>See</u> <u>Chevron</u>, 467 U.S. at 843.  This is an inquiry into the reasonableness of Commerce's interpretation.  <u>See</u> <u>Fujitsu Gen. Ltd. v. United States</u>, 88 F.3d 1034, 1038 (Fed. Cir. 1996) .  In determining whether Commerce's interpretation is reasonable, the Court considers the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the AD

2

duty scheme as a whole.  See Mitsubishi Heavy Indus. v. United States, 15 F. Supp. 2d 807, 813

(Ct. Int'l Trade 1998).  The Court "will not allow an agency, under the guise of lawful discretion,

to contravene or ignore the intent of the legislature or the guiding purpose of the statute."

Ceramica Regiomontana, S.A. v. United States, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986),

aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

    The Court has found Commerce's determinations unsupported by substantial evidence

"where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate

basis for its conclusions." Rhone-Poulenc, Inc. United States, 927 F. Supp. 451, 454 (Ct. Int'l

Trade 1996) ; see also Asociacion Colombiana de Exportadores de Flores v. United States, 6 F.

Supp. 2d 865, 880 (Ct. Int'l Trade 1998) (stating that a change in practice requires Commerce to

explain the basis for its change and that such basis must be in accordance with law and supported

by substantial evidence).  Even where Commerce has acted in conformity with its statutory and

regulatory obligations, the resulting margin must be examined for its accuracy and fairness.  See

NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

    Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Consolo v. Fed. Maritime

Comm'n, 383 U.S. 607, 619-20 (1966)  (quoting Consolidated Edison Co. of New York v.

NLRB, 305 U.S. 197, 229 (1938)), PAM, S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir.

2009).  In order for a determination to satisfy this standard, "{t}here must be a rational

connection between the facts found and the choice made." Burlington Truck Lines, Inc. v.

United States, 371 U.S. 156, 168 (1962); Nucor Corp. v. United States, 32 CIT 1380, 594 F.

Supp. 2d 1320, 1331-32 (2008).  Additionally, "{t}he substantiality of evidence must take into

account whatever in the record fairly detracts from its weight." Universal Camera Corp. v.

NLRB, 340 U.S. 474, 488 (1951).

## II.    STATEMENT OF THE CASE

On June 11, 2021, pursuant to requests from Calgon Carbon Corporation and Cabot Norit

Americas Inc. (formerly Norit Americas Inc.) (collectively "Petitioners"), and companies who

self-requested administrative review, Commerce published a notice initiating the fourteenth AD

administrative review of certain activated carbon from the People's Republic of China ("China")

covering the period April 1, 2020 through March 31, 2021 with respect to 20 exporters of subject

merchandise. See Initiation of Antidumping and Countervailing Duty Administrative Reviews,

86 Fed. Reg. 31,282, 31,289 (Dep't Commerce June 11, 2021).  On August 5, 2021, after placing

the CBP data on the record and inviting interested parties to comment on these data, Commerce

selected Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") and Plaintiff Jilin Bright as the

mandatory respondents for individual investigation in this administrative review.  See

Memorandum re: "Fourteenth Antidumping Duty Administrative Review of Certain Activated

Carbon from the People's Republic of China: Respondent Selection," PD 50, (Aug. 5, 2021)

("Respondent Selection Memorandum").

On May 6, 2022, Commerce published the Preliminary Results.  See Certain Activated

Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty

Administrative Review, Preliminary Determination of No Shipments; 2020–2021, 87 Fed. Reg.

27,094 (Dep't Commerce May 6, 2022), PD 304, ("Preliminary Results").  Concurrent with the

Preliminary Results, Commerce issued the Preliminary Decision Memorandum and the

Preliminary Surrogate Value Memorandum.  See Memorandum re: Decision Memorandum for

the Preliminary Results of Antidumping Duty Administrative Review: Certain Activated Carbon

from the People's Republic of China; 2020-2021, PD 299, (Apr. 29, 2022) ("PDM"); see also Memorandum re: Surrogate Values for the Preliminary Results, PD 302, (Apr. 29, 2022) ("Prelim. SV Memo").

In the Preliminary Results, Commerce valued the BITCOAL factor of production reported by Jilin Bright's suppliers using the Malaysia import average unit value ("AUV") under HTS 2701.12. See Prelim. SV Memo, at 4. In addition, Commerce valued coal tar pitch consumption using Malaysian HTS 2706.00 at an AUV of 5.16 RM/KG (about 1.24 USD/KG). Id.

On November 9, 2022, Commerce published the Final Results. See Final Results, 87 Fed. Reg. at 67,671. Additionally, Commerce released the Final Decision Memorandum accompanying the Final Results as well as Final Surrogate Value Memorandum. See Memorandum re: Surrogate Values for the Final Results, PD 346-347, (Nov. 2, 2022) ("Final SV Memo"). In the Final Results, Commerce used the same surrogate value ("SV") data as were used in the Preliminary Results except for the changes made in the calculation of financial ratios. See Final SV Memo, at page 2 and Attachment 1. Specifically, regarding the bituminous coal SV, Commerce did not make any changes to its reliance on the Malaysian import data under HTS 2701.12 to value bituminous coal input. See IDM, at 21. Commerce determined that all of Jilin Bright's test samples meet the dual criteria under Note 2 of Chapter 27 of the HTS, i.e., a volatility matter content of 14 percent and a calorific value of 5,833 kcal/kg, to be classified as bituminous coal. See id. at 23. Further, Commerce declined to rely on Malaysian domestic prices for coal tar and continued to use the Malaysian import data under HTS 2706.00 because it found that the record lacked explanation regarding the methodology of data collection for the Malaysian domestic prices. See id. at 27-28.

III.    **ARGUMENT**

   A. **COMMERCE'S DETERMINATION TO VALUE JILIN BRIGHT'S COAL
      USING IMPORT STATISTICS INTO MALAYSIA UNDER HTS 2701.12
      RATHER THAN MALAYSIAN HTS 2701.19 WAS NOT SUPPORTED BY
      SUBSTANTIAL EVIDENCE**

           1. **Legal Standard for Review of Commerce's Surrogate Value
              Determinations and Background**

   In non-market economy ("NME") cases, Commerce obtains a normal value ("NV") by

adding the value of factors of production ("FOP") used to produce the subject merchandise and

"an amount for general expenses and profit plus the cost of containers, coverings, and other

expenses." 19 U.S.C. § 1677b(c)(1). Commerce must value FOPs "based on the best available

information regarding the values of such factors in a market economy country or countries." Id.

When evaluating what constitutes the best available information for valuing a factor of

production, Commerce normally considers whether each potential surrogate value: (1) is publicly

available; (2) is contemporaneous with the POR; (3) represents a broad market average covering

a range of prices; (4) is from an approved surrogate country; (5) is specific to the input in

question; and (6) is tax exclusive. See Import Admin., U.S. Dep't Commerce, Non–Market

Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at

https://enforcement.trade.gov/policy/bull04-1.html (last visited May 15, 2023);see also, Certain

Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the Fifth New

Shipper Review, 75 Fed. Reg. 38,985 (Dep't of Commerce July 7, 2010) and accompanying

Issues and Decision Memorandum (Dep't of Commerce July 7, 2010), at Comment 1. As "best

available information" is not statutorily defined, Commerce has discretion to determine what

data constitutes the best available information in each case and to value the FOPs accordingly.

See QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011). This discretion is

broad but is not unlimited; "the critical question is whether the methodology used by Commerce

is based on the best available information and establishes the antidumping margins as accurately

as possible." Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir.

2001).

      The heat value of coal is typically calculated using either the Gross Calorific Value

("GCV") or the Net Calorific Value ("NCV"). Both methods provide an estimate of the amount

of heat energy that can be generated by burning a unit of coal. The Unit Heat Value ("UHV")

and NCV are often used interchangeably to refer to the same thing. Both UHV and NCV are a

measure of the amount of heat energy released by the combustion of a fuel, considering the latent

heat of vaporization of any water produced during combustion. See Letter from GDLSK LLP,

"DJAC's Final Surrogate Value Rebuttal Comments and Pre-Preliminary Comments" at Exhibit

1A (Apr. 18, 2022), PD 288, ("DJAC's Final SV Rebuttal Comments").

      On October 18, 2021, Commerce provided all interested parties the opportunity to

comment on the surrogate country list, the selection of a surrogate country, and the selection of

surrogate values. See Memorandum Re: "Request for Economic Development, Surrogate

Country and Surrogate Value Comments and Information" (Oct. 18, 2021), PD 96. On

November 15, 2021, Jilin Bright provided comments regarding the selection of surrogate values

pursuant to Commerce's October 18, 2021 memorandum. See Letter from Trade Pacific PLLC,

"Activated Carbon from the People's Republic of China – Surrogate Value Comments" (Nov.

15, 2021), PD 110-111. The other mandatory respondent, DJAC, submitted its first surrogate

value comments. See Letter from GDLSK LLP, "DJAC's First Surrogate Value Comments"

(Nov. 15, 2021), PD 115-158, ("DJAC's First SV Comments"). On March 30, 2022, Jilin Bright

7

and DJAC submitted the final surrogate value comments.  <u>See</u> Letter from Trade Pacific PLLC,

"Activated Carbon from the People's Republic of China – Surrogate Value Information" (Mar.

30, 2022), PD 248; <u>see also</u> Letter from GDLSK, "DJAC's Final Surrogate Value Comments"

(Mar. 30, 2022) ("DJAC's Final SV Comments"), PD 230-245.  On April 18, 2022, DJAC

submitted the final surrogate value rebuttal comments.  <u>See</u> DJAC's Final SV Rebuttal

Comments, PD 288.

In the <u>Preliminary Results</u>, Commerce valued the BITCOAL factor of production

reported by Jilin Bright's suppliers using the Malaysia import AUV under HTS 2701.12.  <u>See</u>

Prelim. SV Memo, at 4.  After the <u>Preliminary Results</u>, Commerce collected additional

information regarding the characteristics of the factor reported in the BITCOAL field.  On June

15, 2022, Jilin Bright responded to Commerce's supplemental questionnaire wherein Commerce

requested that Jilin Bright provide test reports and a worksheet summarizing the moisture, ash,

and volatile matter content in the manner provided on "page 9 of Datong Juqiang Activated

Carbon Co. Ltd. (DJAC)'s Final SV Rebuttal Submission."  <u>See</u> Letter from Trade Pacific

PLLC, "Activated Carbon from the People's Republic of China – Third Supplemental Section D

Response" at page S3-2 (June 15, 2022), CD 213-215, PD 320 ("Jilin Bright's Third Supp. D

Response"); <u>see also</u>, DJAC's Final SV Rebuttal Comments, at pages 8-9, PD 288 (wherein,

DJAC calculated the GCV using the formula GCV = UHV * 1.053).

In the <u>Final Results</u>, regarding the bituminous coal SV, Commerce declined to modify its

reliance on the Malaysian import data under HTS 2701.12 to value bituminous coal input.  <u>See</u>

IDM, at 21.  Commerce determined that all of Jilin Bright's test samples meet the dual criteria

under Note 2 of Chapter 27 of the HTS, i.e., a volatility matter content of 14 percent and a

calorific value of 5,833 kcal/kg, to be classified as bituminous coal.  <u>See id.</u> at 23.

### 2. Analysis

Commerce's use of the Malaysia import AUV under HTS 2701.12 to value Jilin Bright's

BITCOAL factor of production is unsupported by substantial evidence because AUV under HTS

2701.12 is not product-specific and internally inconsistent. Moreover, Commerce's

determination to use Petitioners' preferred formula for determining the GCV of Jilin Bright's

coal was arbitrary and not supported by substantial evidence.

### a. HTS 2701.12 is Not Product Specific and Reflects Anomalous Values

The Malaysia HTS 2701.12 that Commerce used to value Jilin Bright's BITCOAL factor

of production includes both coking coal and non-coking coal and the average unit values therein

are internally inconsistent and otherwise anomalous. In its brief before the agency, DJAC argued

that Malaysia HTS 2701.12 average unit values were anomalous as evidenced by comparisons to

other benchmarks on the record and by comparison of the average unit value of coking coal and

non-coking coal. See Case Brief of Datong Juqiang, July 11, 2022, at 15-17, CD 221-222, PD

329-330 ("DJAC Case Brief"). Commerce's Final Results failed to address these points with its

single conclusory statement dismissing the arguments as "without merit because the record lacks

sufficient benchmark data or other price information demonstrating that the Malaysia import data

reported under HTS 2701.12 are aberrantly high." IDM, at 21.

The Malaysia HTS 2701.12 includes non-coking bituminous coal, or thermal coal, with

an AUV of about $200 per metric ton and coking coal, metallurgical coal, with an AUV of about

$110 per metric ton. See DJAC's First SV Comments, Ex 3A(i), PD 115. However, all other

evidence on the record indicates that coking coal and non-coking coal should have the exact

opposite price correlation. The U.S. Energy Information ("EIA") Annual Coal Report 2020

reported:

9

- The average sales price of thermal coal in 2020 decreased by 9.4% from the 2019 level to $24.93 per short ton, and the average sales price of metallurgical coal in 2020 decreased by 21.0% from the 2019 level to $110.64 per short ton.

- Average sales price of bituminous coal was $50.05 per short ton in 2020, a 15.1% decrease from the 2019 level.

- In the US market during 2020, metallurgical or coking coal was exported, imported and domestically sold at $104.55/MT, $136.71/MT and $91.93/MT respectively. In contrast, non-metallurgical or non-coking coal during 2020 was exported, imported and domestically sold at $62.51/MT, $67.40/MT and $27.68/MT respectively.

Id., at Exhibit 3F, PD 120-122.

Moreover, record evidence of world 2020–2021 prices demonstrated that contract prices and spot prices for coking coal ranged from $157 to $161 per MT and $157 to $162 per MT, respectively. Id., at Exhibit 3C, PD 115-119. At the same time, world 2020–2021 prices demonstrated that contract prices and spot prices for non-coking coal ranged from $68 to $71 per MT and $64 to $66 per MT, respectively. Id. Thus, non-coking coal sold in 2019 and 2020 at prices a quarter to a half of the prices for coking coal based on the world prices and the EIA prices in the United States. The AUV of the Malaysian imports under HTSF 2701.12 reflects the exact opposite price correlation and Commerce did not address this concern in its Final Results. Having failed to address or consider this evidence detracting from the reliability of the surrogate value that Commerce selected, Commerce's determination that the AUV under HTS 2701.12 was the best available information to value Jilin Bright's BITCOAL factor of production lacks a basis in substantial evidence. This Court "must consider the record as a whole, including evidence which 'fairly detracts from its weight', to determine whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB., 340 U.S. 474, at 477-78 (1951)).

10

At the same time, the AUV for imports under Malaysia HTS 2701.19 provides reliable, product specific values to value Jilin Bright's BITCOAL.   The AUV under 2701.19 is based on over 6.5 million metric tons of imports and its AUV is consistent with all other record evidence regarding the price for non-coking coal.  As explained above, the world 2020-2021 prices for non-coking coal ranged from $68 to $71 per ton and $64 to $66 per ton for contract and spot prices, respectively. See DJAC's First SV Comments, Exhibit 3F, PD 120-122.  The U.S. export and domestic prices for non-coking coal in 2020 was $63 per ton and $28 per ton respectively. Id., Exhibit 3A(i), PD 115. Thus, the accuracy and reliability of the AUV under HTS 2701.19 of $0.07 per kg, or $70 per ton, is further supported by the other information on the record.  The AUV under HTS 2701.19 is the best available information to value Plaintiff's BITCOAL factor of production because of its representativeness and reliability.  But, it is also the appropriate surrogate value after closer examination of Commerce's arbitrary calculation of the GCV associated with Jilin Bright's BITCOAL factor or production as discussed in more detail below.

### b.   Commerce's Chosen Formula for Determining the Gross Calorific Value of Jilin Bright's Coal Is Not Supported by Substantial Evidence

In Jilin Bright's Third Supp. D Response, Jilin Bright responded to Commerce's supplemental questionnaire wherein Commerce requested that Jilin Bright provide test reports and a worksheet summarizing the moisture, ash, and volatile matter content in the manner provided on "page 9 of Datong Juqiang Activated Carbon Co. Ltd. (DJAC)'s Final SV Rebuttal Submission." See Jilin Bright's Third Supp. D Response, at page S3-2 (June 15, 2022), CD 213-215, PD 320.  Jilin Bright supplied the requested test reports and the summary table at Exhibits S3-1 and S3-2. Id. The summary worksheet for the test reports is as follows:

**Table 1**

| Test Sample | | M (%) | A (%) | Vol (%) | Vol % > 14% ? | UHV (Kcal/Kg) | GCV (Kcal/kg) = 1.053 * UHV | | Correct HTS |
|---|---|---|---|---|---|---|---|---|---|
| [        ] TEST 1 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 1 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 1 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 1 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 1 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 1 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 2 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 2 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 2 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 3 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 4 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 5 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 6 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 7 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 8 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 9 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 10 | [ | | | | | | | ] | HTS 2701.19 |
| [        ] TEST 10 | [ | | | | | | | ] | HTS 2701.19 |

The universally harmonized sub-heading Note 2 to Chapter 27 defines "bituminous coal" as follows:

> For the purposes of subheading 2701.12, "bituminous coal" means coal having a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent and a calorific value limit (on a moist, mineral-matter-free basis) equal to or greater than 5,833 kcal/kg.

DJAC's First SV Comments, at Exhibit 3B, PD 115.

Thus, a plain reading of the HTS descriptions together with the directive of Note 2 confirms that "bituminous coal" for purposes of HTS 2701.12 covers only such coal with (a) a

12

heat value ≥ 5,833 kcal/kg, and (b) a volatile matter > 14%. Consequently, "Other coal" in HTS 2701.19 encompasses all types and grades of coal except anthracite coal and "bituminous coal" as defined in subheading Note 2. Accordingly, coal that is traded as "bituminous coal" or sub-bituminous coal but fails to satisfy either of the above two qualifying criteria (heat value and volatile matter) for "bituminous" coal (under HTS 2701.12), automatically falls under the residual heading HTS 2701.19.

While the volatile matter of Jilin Bright's supplier's coal [

] less than 5,833 kcal/kg as established in Exhibit S3-2 when using the formula GCV = 1.053 * UHV as instructed in Commerce's supplemental questionnaire. See Jilin Bright's Third Supp. D Response, at Ex S3-2 (June 15, 2022), CD 213-215, PD 320. Yet, in the Final Results, Commerce relied on Petitioners' preferred calculation for converting from UHV to GCV using the formula GCV = (UHV + 3645 − 75.4 M) / 1.466, where "M" is an inherent moisture level of five percent. IDM, at 23.

Commerce's decision to use Petitioners' formula suffers from several flaws. First, this formula relies on the assumption that the intrinsic moisture level of Jilin Bright's coal is five percent. There is no record evidence indicating that this is accurate. The five percent intrinsic moisture assumption is based on an average suggested by Petitioners of six averages in a single article filed by Petitioners that it obtained from pdfcoffee.com. See Petitioners' Submission of Information to Rebut, Clarify, or Correct DJAC's June 17, 2022 Supplemental Questionnaire Response, Exhibit 1 ("pdfcoffee.com Article"), page 6 of 10, (June 24, 2022), PD 324 ("Petitioners Post-Preliminary Rebuttal"). The pdfcoffee.com Article cited by Petitioners did not express in any part of its contents that the "M" inherent moisture is 5 percent. Id. Rather, Petitioners seem to have "eye-balled" an average of six averages in Table 6 of the pdfcoffee.com

Article wherein averages were reported as 5.3%, 5.7%, 7.6%, 5.4%, 4.6%, and 6.7%. Id.

Furthermore, the average of these averages in Table 6 of the pdfcoffee.com Article is actually

5.88 percent, not 5 percent. In addition, the self-selected 5 percent intrinsic moisture percent

ignores that the moisture contents in Table 6 range significantly with maximum moistures

ranging from 8.3 percent 10 percent. Id. The results of the calculation differ depending on the

intrinsic moisture assumed in the calculation. There is no evidence to indicate that the intrinsic

moisture reported in Table 6 of the pdfcoffee.com Article is representative of Jilin Bright's coal,

but even so the moisture levels reported there could show that the GCV of its factor is below

5833 kcal/kg. For example, if an intrinsic moisture of 8.3 % is assumed, then most of the Jilin

Bright test samples would show GCV below 5833 kcal/kg and at 10% assumed moisture, all of

the test results would show GCV below 5833 kcal/kg. For reference, the table below, adapted

from Jilin Bright's Third Supplemental, Exhibit S3-2, CD 215, summarizes the results if an

intrinsic moisture of 8.3 percent is assumed. In this case, twelve of the eighteen observations

show GCV below 5833 kcal/kg.

**Table 2**

| | | TM (%) | A (%) | Vol (%) | UHV (Kcal/Kg) | | Intrinsic Moisture - M | B | C= B *M | Constant D | | E= UHV + C + D | | F | | GCV = E / F | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [          ] TEST 1 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [DTGH] TEST 1 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [          ] TEST 1 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [          ] TEST 1 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [          ] TEST 1 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [          ] TEST 1 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [          ] TEST 2 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [          ] TEST 2 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [          ] TEST 2 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [    ]<br>TEST 3 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 4 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 5 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 6 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 7 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 8 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 9 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 10 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |
| [    ]<br>TEST 10 | [ | | | | | ] | 8.3 | -75.4 | -625.82 | 3645 | [ | | ] | 1.466 | [ | | ] |

Commerce's finding that the inherent moisture level of Jilin Bright's coal is five percent was arbitrary and enabled a determination of the GCV of Jilin Bright's coal that was not supported by substantial evidence. Moreover, Commerce's resort to the pdfcoffee.com Article formula was not necessary.

Commerce should have continued to use the formula it suggested in the post-preliminary results supplemental questionnaires of GCV = 1.053 * UHV. See Jilin Bright's Third Supp. D Response, at page S3-2 (June 15, 2022), CD 213-215, PD 320. This formula avoids the arbitrary assignment of the intrinsic moisture percent and accurately expresses the GCV of Jilin Bright's coal. As shown above at Table 1, applying this formula, all of Jilin Bright's coal is below 5833 kcal/kg and properly classified under Malaysian HTS 2701.19.

Commerce's reliance on Petitioners' preferred formula from the pdfcoffee.com Article is also arbitrary because the same report upon which Petitioners relied contained another alternative formula that Petitioners and Commerce ignored. Specifically, on the same page possessing the formula that Petitioners proposed, the article contains a formula expressing the relationship between GCV and UHV as "GCV = 2111 + 0.6812 x UHV". That the same report possessed multiple formulas to express the GCV and the record includes the IEA supported formula of

15

GCV = 1.053 * UHV demonstrates that there is no authoritative formula for expressing the GCV. In this case, Commerce selected the formula that generated the highest GCVs as compared to either of the other formulas without explanation why its selected formula yields the most accurate results.

For these reasons, the SV assigned by Commerce to Jilin Bright's BITCOAL utilizing the Malaysia import AUV under HTS 2701.12 is unsupported by substantial evidence, and the Court should direct Commerce to revalue Jilin Bright's BITCOAL using the Malaysia import AUV under HTS 2709.19.

## B. COMMERCE'S DETERMINATION TO VALUE JILIN BRIGHT'S COAL TAR PITCH USING THE AVERAGE UNIT VALUE OF MALAYSIAN IMPORTS OF HTS 2706 WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

### 1. Additional Factual Background

In the Prelim. SV Memo, Commerce valued coal tar pitch consumption using Malaysian HTS 2706.00. See Prelim. SV Memo, at 4 and Attachment 1. Specifically, Commerce valued coal tar pitch consumption using under Malaysian HTS 2706.00 at an AUV of 5.16 RM/KG (about 1.24 USD/KG). See id.

In briefing before Commerce, Jilin Bright argued that the UMR Coal Tar Report offered contemporaneous pricing for the exact specifications of Jilin Bright's coal tar and thus were the source of information on the record most specific to valuing Jilin Bright's factor of production for coal tar. See Letter from Trade Pacific PLLC, "Activated Carbon from the People's Republic of China – Case Brief" at 4-8 (July 8, 2022), CD 220, PD 328 ("Jilin Bright's Case Brief"). Jilin Bright also identified deficiencies in the AU V under Malaysian HTS 2706. Id. In the Final Results, Commerce continued to rely on the Malaysian import data under HTS 2706 (Mineral

Tars, Including Reconstituted Tars) reported by Global Trade Atlas (GTA) to value coal tar pitch.  IDM, at 27.

### 2. Analysis

#### a. The UMR Coal Tar Report Provides More Specific Pricing Information Related to the Input Being Evaluated Compared to The Malaysian AUV Classified Under HTS 2706

The UMR Coal Tar Report POR price is far more specific to the factor of production being valued than the basket category covered by HTS 2706.  The UMR Coal Tar Report reported separately prices for coal tar (50-65% pitch content), partially distilled tar/pitch (65-99% pitch content), and pure pitch (100% pitch content).  See DJAC's First SV Comments, Part 18-19, at Exhibit 5Q, pages 68-69, PD 133.  Jilin Bright's Supplier B consumed coal tar pitch in production of the merchandise under consideration and provided the pitch content of all its coal tar pitch consumption.  See Letter from Trade Pacific PLLC, "Activated Carbon from the People's Republic of China – Supplemental Section D Response" at Exhibit SD-15.2 (March 21, 2022), CD 135-158, PD 226 ("Jilin Bright's First Supp. D Response").  Id.  The range of pitch content in the coal tar pitch consumed by Supplier B was from [                    ].  Id. The weighted-average pitch content of the coal tar pitch consumed during the POR was [    ] percent.  Id.  Accordingly, Jilin Bright's reported coal tar corresponds with UMR's categories of "coal tar (50-65% pitch content)" and "partially distilled tar/pitch (65-99% pitch content)."

In addition, the UMR Coal Tar Report details prices of coal tar pitch for different applications including chemicals, pharmaceuticals, consumer goods, construction & roofing, and others.  See DJAC's First SV Comments, at Exhibit 5Q, page 68, PD 133.  By relying on prices for chemical applications, Commerce would obtain a value more specific to the production of activated carbon.  In contrast, the import AUV for 2706 is a basket category that is not specific to

17

chemical applications. Thus, the UMR Coal Tar Report prices are the most specific information on the record with which to value Jilin Bright's suppliers' coal tar.

Commerce dismissed UMR Coal Tar Report stating that it "does not explain the methodology used to obtain the prices it reports, and as such Commerce cannot confirm their validity." IDM, at 28. However, Chapter 3, titled "Research Methodology", of the UMR Coal Tar Report explained the research methodology in considerable detail. Commerce's IDM ignored these explanations of the Research Methodology. This chapter of the UMR Coal Tar Report described the "Market Research Process" and the "data triangulation" method as "a way of assuring the validity of research through the use of a variety of methods to collect data." See DJAC's First SV Comments, at Exhibit 5Q, at pages 12-14, PD 132. The Research Methodology chapter detailed the primary and secondary sources of information. Id. The primary sources of information are from CEOs, sales managers, purchasing managers, research analysts, and others. Id. The secondary sources of information include annual reports, financial reports, broker reports, investor presentations, SEC filings, national government statistical databases, market reports, news articles, Factiva, OneSource, Hoovers, Statista, and others. Id. Thus, Commerce's statement in the IDM that the UMR Coal Tar Report lacked an explanation of its research methodology is contradicted by the record. In contrast, Commerce relied on other information sources accepting their validity at face value despite the absence of explanation of research methodology, credentials of authors, or the sources public-availability. For example, the pdfcoffee.com Article submitted by Petitioners that Commerce used to determine its GCV formula to determine Jilin Bright's coal characteristics possesses far less explanation regarding its methods and sources, the credentials of its author, or its public-availability. Specifically, the pdfcoffee.com Article was "For Internal Use Only" and "released by email" to "All BD Team

18

Members" and the credentials of the author were not specified. See Petitioners Post-Preliminary Rebuttal, Exhibit 1 (June 24, 2022), PD 324.

Commerce's rationale for not considering the UMR Coal Tar Report is contradicted by the record and cannot be sustained as supported by substantial evidence. The UMR Coal Tar Report is the only source on the record that possesses surrogate values that are specific to Jilin Bright's coal tar and are the best available information. As explained in more detail below, the AUV under Malaysia HTS 2706 is a basket category and not specific to the factor that Commerce is attempting to value. Furthermore, the record contains compelling evidence that the import AUV under 2706 is not the best available information.

Accordingly, Commerce's reliance on the import AUV under Malaysia HTS 2706 to value Jilin Bright's Supplier B's coal tar pitch consumption was not supported by substantial evidence. Instead, Commerce should have relied on the UMR Coal Tar Report price for chemical applications of 174 USD/MT.

### b. The Malaysian AUV Under HTS 2706.00 Is Not the Best Available Information for Determining the Value Of Coal Tar Pitch

When evaluating the surrogate value for coal tar pitch, Commerce failed to select the best available information on the record considering the unreliable and anomalous nature of the Malaysian import AUV for coal tar. Commerce's decision to value Jilin Bright's coal tar pitch using the AUV of Malaysian import data under HTS 2706.00 was unsupported by substantial evidence. To value the coal tar pitch most accurately, Commerce should instead utilize the data provided by the UMR Coal Tar Report because the report offers more specific pricing information as explained above. Further, if Commerce determines that it cannot rely on the UMR Coal Tar Report, then Commerce should use the AUVs under HTS 2706 into Russia.

The record indicates that prices for coal tar pitch are higher than prices for coal tar due to the additional processing coal tar pitch undergoes. <u>See</u> DJAC's First Surrogate Value Comments, at Exhibit 5Q, page 32, PD 133. Pitch, further processed from coal tar, falls under HTS 2708.10. <u>Id.</u>, at Exhibit 5B, PD 124. Coal tar pitch is obtained by distilling coal tar at high temperatures, which results in the removal of volatile components and the concentration of pitch. <u>Id.</u>, at Exhibit 5Q, page 28, PD 132. This additional processing makes coal tar pitch a more refined and specialized product than coal tar, which results in a higher AUV. <u>Id.</u> Additionally, coal tar pitch has a higher carbon content and is used in a variety of industrial applications such as the production of aluminum, graphite electrodes, and carbon fibers, which also contribute to its higher AUV. <u>Id.</u> at Exhibit 5B, PD 124.

The fact that AUVs of coal tar pitch should be higher than AUVs of coal tar is further evidenced by the 2021 UMR Coal Tar Report. Pages 42–43, and 68–69 of the UMR Coal Tar Report provide prices in USD/Ton for coal tar, partially distilled tar, and pure pitch by month for 2019 and 2020 in each field of applications in the United States and Malaysia. <u>Id.</u> at Exhibit 5Q, pages 42–43, and 68–69, PD 133. Below are the summaries of the price comparison for coal tar (including coal tar and partially distilled tar) and pure pitch in various applications in Malaysia and United States as reported in the UMR Coal Tar Report.

*Malaysia*

| Applications | Coal Tar (Coal Tar + Partially Distilled Tar, USD/Ton) | Pure Pitch (USD/Ton) |
|---|---|---|
| Chemicals | 200.4 | 435.4 |
| Pharmaceuticals | 273.8 | 492.8 |
| Consumer Goods | 217.1 | 538.6 |
| Construction & Roofing | 228.6 | 437.3 |
| Others | 138.9 | 352.9 |
| **Average** | **211.76** | **451.4** |

20

*United States*

| Applications | Coal Tar (Coal Tar + Partially Distilled Tar, USD/Ton) | Pure Pitch (USD/Ton) |
|---|---|---|
| Chemicals | 189.7 | 425.8 |
| Pharmaceuticals | 293.8 | 482.8 |
| Consumer Goods | 197.3 | 442.4 |
| Construction & Roofing | 157.6 | 412.6 |
| Others | 186.9 | 405.8 |
| **Average** | **205.1** | **433.9** |

This evidence demonstrates that coal tar pitch is more expensive than coal tar, with an average price that is usually more than double that of coal tar.[3]  This trend is further supported by the previous discussion which suggests that coal tar pitch is used in more specialized and higher value applications compared to coal tar, leading to higher demand and higher prices.

However, the reverse relationship exists in the Malaysian import data—the Malaysian import AUV for coal tar (HTS 2706.00) is significantly higher than the Malaysian import AUV for pitch (HTS 2708.10).  During the POR, the AUV for coal tar under Malaysian HTS 2706.00 was 5.16 RM/KG (approximately 1.24 USD/KG) and the AUV for coal tar pitch under HTS 2708.10 was 3.603 RM/KG (approximately 0.87USD/KG)—the AUV for coal tar is **more than 1.4 times** of that for coal tar pitch under the Malaysian import data.  See Final SV Memo, at Attachment 1.  The import AUV of coal tar is significantly higher than the import AUV of pitch demonstrates the unreliable and anomalous nature of the Malaysian import AUV for coal tar.

Moreover, the Malaysian import AUV for coal tar is significantly higher than publicly-available market prices for coal tar and coal tar pitch in Malaysia.  The UMR Coal Tar Report provides analysis and pricing for coal tar (50-65% pitch content), partially distilled tar (65-99%

---

[3]  For example, $451.4/211.76 = \textbf{2.13}$ and $433.9/205.1 = \textbf{2.12}$.

pitch content), and pure pitch (100% pitch content). Id. On page 68 and based on 2021 UMR

analysis, the UMR Coal Tar Report provided prices in USD/MT for coal tar, partially distilled

coal tar pitch, and pure pitch by month for 2019 and 2020. Id. The table below summarizes the

reported prices for Chemicals Applications for the months in the UMR Coal Tar Report that

overlap with the POR.

UMR-Malaysia Coal Tar and Coal Tar Pitch in Chemicals Application (USD/MT) (page 68).

|  | Apr'20 | May'20 | June'20 | July'20 | Aug'20 | Sep'20 | Oct'20 | Nov'20 | Dec'20 | Average |
|---|---|---|---|---|---|---|---|---|---|---|
| Partially Distilled Tar | 210.2 | 201.3 | 187.3 | 164.0 | 156.5 | 154.0 | 154.4 | 165.4 | 172.8 | 174.0 |
| Pure Pitch | 429.5 | 408.1 | 397.6 | 383.0 | 375.4 | 369.6 | 354.5 | 329.6 | 321.5 | $ 374.3 |

Id. Exhibit 5Q, page 68.

The average UMR reported price during the POR was 174 USD/MT while the import

AUV into Malaysia was 1,240 USD/MT, or **more than 7 times** the prices reported in the UMR

Coal Tar Report. The chart above also further demonstrates the anomalous nature of the import

data in that the pitch price is, on average, more than twice the price of the coal tar pitch. Yet, the

Malaysian import AUVs for coal tar are higher than the import AUVs for pitch. The UMR Coal

Tar Report price data demonstrate the unreliable nature of the import AUV into Malaysia under

HTS 2706. First, the import AUV is more than 7 times the UMR Coal Tar Report average

prices. Second, the UMR Coal Tar Report supports the fact that pitch is significantly higher

value than partially distilled coal tar, yet the reverse relationship exists in the Malaysian import

data.

Furthermore, the record contains no evidence, and it would be unreasonable to conclude

that producers of comparable merchandise in Malaysia would rely on imported coal tar at prices

more than 7 times the prices of domestically-available coal tar. The only reasonable conclusion

is that either something is simply wrong in the Malaysian import AUV under HTS 2706 or that

information captured in the import AUV is far less specific to the type of coal tar consumed by Jilin Bright's supplier.  In either case, Commerce could not have reasonably concluded that the import AUV under HTS 2706 was the best available information when product-specific information from the UMR Coal Tar Report was on the record.  Accordingly, Commerce's decision to value coal tar pitch using the Malaysian import data under HTS 2706.00 lacked a basis in substantial evidence and cannot be sustained.

### c.  Reliance on the Russian AUV to Value Jilin Bright's Coal Tar Pitch Is Supported by Substantial Evidence

Even if the Court determines that Commerce reasonably did not rely on the UMR Coal Tar Report, then Commerce should have relied on the AUVs under HTS 2706 into Russia. Among all the potential surrogate countries, Russia accounts for essentially all (99.3%) of the imports.  See DJAC's First SV Comments, Exhibit 5A(i), PD 124.  Where information available within the primary surrogate countries is unreliable, Commerce's practice is to rely on the import AUV from the country on the list of countries economically comparable to China that accounts for the largest quantity of imports.  In this case where Russia accounts for more than 99% of all imports among the economically comparable countries, the import AUV into Russia under HTS 2706 is the most probative import AUV on the record.  Thus, reliance on the Russian AUV of 120.65 USD/MT to value Jilin Bright's coal tar pitch would also be supported by substantial evidence.

Based on the foregoing analysis, Commerce's decision to value Jilin Bright's coal tar pitch using the AUV of Malaysian import data under HTS 2706.00 was unsupported by substantial evidence.  For a more accurate valuation of the coal tar pitch used by Supplier B, Commerce should instead utilize the data provided by the UMR Coal Tar Report as it offers

more specific pricing information.  Alternatively, if Commerce determines that it cannot rely on

the UMR Coal Tar Report, it should resort to using the AUVs under HTS 2706 into Russia.


## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion

for Judgment on the Agency Record and remand this case to Commerce with instructions

consistent with the points set forth in this Memorandum.


Respectfully submitted,

/s/ Jonathan M. Freed

Robert G. Gosselink
Jonathan M. Freed
Doris Di
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

Dated:  May 25, 2023                     *Counsel to Jilin Bright*


24