**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | | |
|---|---|---|
| JILIN BRIGHT FUTURE CHEMICALS CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | Court No. 22-00336 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | PUBLIC VERSION |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CALGON CARBON CORORATION AND NORIT AMERICAS, INC., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENORS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Of Counsel:

RUSLAN KLAFEHN
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CLAUDIA BURKE
Deputy Director

EMMA E. BOND
Trial Attorney | Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-305-2034 | emma.e.bond@usdoj.gov

*Attorneys for Defendant*

August 28, 2023

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENORS'
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD ................................ 1

RULE 56.2 STATEMENT ............................................................................. 2

    I.    The Administrative Determination Under Review ................................ 2

    II.   Issues Presented For Review ......................................................... 2

STATEMENT OF FACTS ............................................................................ 3

    I.    Commerce Initiates The Fourteenth Administrative Review Of The Antidumping
       Duty Order On Certain Activated Carbon From China ......................... 3

    II.   In The Preliminary Results, Commerce Uses Malaysian Import Data Under HTS
       2701.12 And HTS 2706.00 As The Surrogate Values For Jilin Bright's Inputs Of
       Bituminous Coal And Coal Tar Pitch, Respectively ............................. 4

    III.  In The Final Results, Commerce Continues To Use The Same Surrogate Values
       For Jilin Bright's Inputs Of Bituminous Coal And Coal Tar Pitch ............ 5

         A.    Bituminous Coal ................................................................. 6

         B.    Coal Tar ........................................................................... 7

SUMMARY OF ARGUMENT ...................................................................... 8

ARGUMENT ........................................................................................... 9

    I.    Legal Standards ......................................................................... 9

         A.    Standard Of Review ............................................................ 9

         B.    Surrogate Value Selection ....................................................10

    II.   Commerce's Determination To Value Jilin Bright's Bituminous Coal Using
       Malaysian Import Statistics Under HTS 2701.12 Is Supported By Substantial
       Evidence .................................................................................12

A.    Jilin Bright Failed To Exhaust Its Challenge To Commerce's UHV-To-GCV Conversion Formula ....................................................................13

B.    Substantial Evidence Supports Commerce's Use Of The GCV Conversion Formula ................................................................................................17

C.    Commerce Reasonably Determined That The Malaysian Import Data For HTS 2701.12 Are Not Aberrant ............................................................22

III.    Commerce's Use Of Malaysian Import Data Under HTS 2706.00 As The Surrogate Value For Jilin Bright's Coal Tar Pitch Input Is Lawful And Supported By Substantial Evidence.......................................................................................24

A.    Substantial Evidence Supports Commerce's Determination That Malaysian Import Data Under HTS 2706.00 Are Product-Specific, Representative Of A Broad Market Average, And Tax- And Duty-Exclusive ..............................................................................................25

B.    Substantial Evidence Supports Commerce's Determination That The Malaysian Import Value Under HTS 2706 Are Not Aberrant.................27

C.    Commerce Reasonably Rejected Jilin Bright's Proposed Alternatives.....29

CONCLUSION.......................................................................................................30

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Boomerang Tube LLC v. United States,*
  856 F.3d 908 (Fed. Cir. 2017) ...................................................................... 13, 16

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,*
  5 F.4th 1367 (Fed. Cir. 2021) ............................................................................18

*Calgon Carbon Corp. v. United States,*
  443 F. Supp. 1344 (Ct. Int'l Trade 2020)...........................................................23

*Camp v. Pitts,*
  411 U.S. 138 (1973)............................................................................................

*Carbon Activated Tianjin Co. v. United States,*
  -- F. Supp. 3d --, 2023 WL 4678995 (Ct. Int'l Trade, July 21, 2023) ........................ 12, 27, 29

*Cleo Inc. v. United States,*
  501 F.3d 1291 (Fed. Cir. 2007)...........................................................................10

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ...................................................................................... 10, 19

*Corus Staal BV v. United States,*
  502 F.3d 1370 (Fed. Cir. 2007)...........................................................................13

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015).............................................................................3

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996) ............................................................................

*Home Meridian Int'l. Inc. v. United States,*
  772 F.3d 1289 (Fed. Cir. 2014)...........................................................................30

*Jacobi Carbons AB v. United States,*
  313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ................................................. 10, 23

*Jiaxing Bro. Fastener Co., Ltd. v. United States,*
  822 F.3d 1289 (Fed. Cir. 2016).................................................................. 11, 29, 30

*Lifestyle Enterprise, Inc. v. United States*,
    751 F.3d 1371 (Fed. Cir. 2014).........................................................................24, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................................23

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999)..............................................................................11

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009)..............................................................................10

*NMB Singapore Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009)..............................................................................23

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009)..............................................................................22

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)..............................................................................11

*U.S. Steel Corp. v. United States*,
    621 F.3d 1351 (Fed. Cir. 2010)..............................................................................10

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)..................................................................................................9

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011)..............................................................................24

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................9

19 U.S.C. § 1673 ......................................................................................................10

19 U.S.C. § 1675(a)(1) .............................................................................................10

19 U.S.C. § 1675(a)(2)(ii) ........................................................................................10

19 U.S.C. § 1677b(c)(1) ........................................................................................6, 10

19 U.S.C. § 1677b(c)(1)(B) ...................................................................................3, 11

19 U.S.C. § 1677b(c)(3) ...........................................................................................11

19 U.S.C. § 1677(35)(A) ..........................................................................................10

19 U.S.C. § 351.309(c)(2) ........................................................................13

28 U.S.C. § 2637(d) ................................................................................13

**REGULATIONS**

19 C.F.R. § 351.408(c)(2) ............................................................... 7, 11, 29

**RULES**

Rule 56.2.............................................................................................1, 2

**FEDERAL REGISTER NOTICES**

*Carbazole Violet Pigment 23 from China: Fina Results of Antidumping DutyAdministrative Review*,
    75 Fed. Reg. 36,630 (Dep't of Commerce, June 28, 2010) ....................................22

*Certain Activated Carbon from China: Final Results of Antidumping Duty Administrative Review*,
    80 Fed. Reg. 61,172 (Dep't of Commerce, Oct. 9, 2015)................................22, 23

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review:*
    83 Fed. Reg.53,214 (Dep't of Commerce, Oct. 22, 2018)........................................27

*Certain Activated Carbon From China*,
    87 Fed. Reg. 27,094 (Dep't of Commerce, May 6, 2022)....................................3, 4

*Certain Activated Carbon From China*,
    87 Fed. Reg. 67,671 (Dep't of Commerce, Nov. 9, 2022) ..................................2, 5

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    86 Fed. Reg. 31282 (Dep't of Commerce, June 11, 2021)........................................3

*Notice of Antidumping Duty Order: Certain Activated Carbon from China*,
    72 Fed. Reg. 20,988 (Dep't of Commerce, Apr, 27, 2007)........................................3

*Polyethylene Terephthalate Film, Sheet, and Strip from China: Final Determination of Salles at Less Than Fair Value*,
    73 Fed. Reg. 55,039 (Dep't of Commerce, Sept. 24, 2008)....................................17

*Pure Magnesium from China: Final Results of Antidumping Duty Administrative Review: 2011-2012*,
    79 Fed. Reg. 94 (Dep't of Commerce, Jan. 2, 2014) ............................................27

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| JILIN BRIGHT FUTURE CHEMICALS CO., LTD., | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., | ) ) ) ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | )   Court No. 22-00336 |
| UNITED STATES, | ) ) |
| Defendant, | )   PUBLIC VERSION ) |
| and | ) ) |
| CALGON CARBON CORORATION AND NORIT AMERICAS, INC., | ) ) ) |
| Defendant-Intervenors. | ) ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENORS'
MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully responds to the motions for judgment on the

administrative record filed by plaintiff, Jilin Bright Future Chemicals Co., Ltd. (Jilin Bright), and

plaintiff-intervenors, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. (Cherishmet)

and Datong Municipal Yunguang Activated Carbon Co., Ltd. (Yunguang).  Jilin Bright,

Cherishmet, and Yunguang challenge the final results of the U.S. Department of Commerce

(Commerce) in the fourteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China (China), disputing Commerce's selection of surrogate values for Jilin Bright's inputs of bituminous coal and coal tar pitch.  As explained below, the motions should be denied because Commerce's final results are supported by substantial evidence and are otherwise in accordance with law.[1]

RULE 56.2 STATEMENT

## I.      The Administrative Determination Under Review

This action challenges Commerce's final results of the fourteenth administrative review of the antidumping duty order on certain activated carbon from China.  *See Certain Activated Carbon From China*, 87 Fed. Reg. 67,671 (Dep't of Commerce, Nov. 9, 2022) (final results) (P.R. 351), and the accompanying Issues and Decision Memorandum (Nov. 3, 2022) (IDM) (P.R. 345).  The period of review is April 1, 2020, through March 31, 2021.

## II.     Issues Presented For Review

1.      Whether Commerce's determination to value Jilin Bright's bituminous coal using import statistics from Malaysia under harmonized tariff schedule (HTS) classification 2701.12 for "Bituminous Coal," rather than Malaysian HTS classification 2701.19 for "Other Coal," is supported by substantial evidence.

2.      Whether Commerce's determination to value Jilin Bright's coal tar pitch using the average unit value of Malaysian imports under HTS 2706.00 is supported by substantial evidence.

---

[1]  In their motion for judgment on the agency record, Cherishmet and Yunguang "incorporate by reference" the arguments made by "Jilin Bright in support of its 56.2 Motion for Judgment Upon the Agency Record."  Pl.-Intervenor Br., ECF No. 39 (June 8, 2023).  Accordingly, this response addresses the arguments made in Jilin Bright's brief.  *See* Jilin Bright Br., ECF Nos. 37, 38 (May 25, 2023).

## STATEMENT OF FACTS

I   Commerce Initiates The Fourteenth Administrative Review Of The Antidumping Duty
    Order On Certain Activated Carbon From China

In April 2007, Commerce published the antidumping duty order covering the subject
merchandise. *Notice of Antidumping Duty Order: Certain Activated Carbon from China*, 72
Fed. Reg. 20,988 (Dep't of Commerce, Apr. 27, 2007).  Having received several timely requests
for review of the order, on June 11, 2021, Commerce initiated an administrative review of 20
exporters of subject merchandise, including Jilin Bright, Cherishmet, and Yunguang. *Initiation
of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 31,282, 31,289
(Dep't of Commerce, June 11, 2021) (P.R. 12).  Commerce selected Jilin Bright and Datong
Juqiang Activated Carbon Co., Ltd. (Datong Juqiang) as mandatory respondents.[2]  *Certain
Activated Carbon From China*, 87 Fed. Reg. 27,094 (Dep't of Commerce, May 6, 2022)
(preliminary results) (P.R. 304), and the accompanying Preliminary Decision Memorandum
(Apr. 29, 2022) (PDM) at 2 (P.R. 299).

When, as here, Commerce has determined that the exporting country is a nonmarket
economy country, Commerce "determines normal value by valuing the 'factors of production'
used in producing the merchandise in a comparable market economy." *Downhole Pipe &
Equip., L.P. v. United States*, 776 F.3d 1369, 1374–75 (Fed. Cir. 2015) (quoting 19 U.S.C.
§ 1677b(c)(1)(B)).  In this way, Commerce determines "surrogate values" for the factors of
production. *Id.*  On October 18, 2021, Commerce requested comments from interested parties on
Commerce's list of economically comparable countries, surrogate value country selection, and
surrogate value data.  PDM at 10.  Commerce's Office of Policy identified Brazil, Malaysia,

---

[2]  Datong Juqiang has not filed a challenge to the final results in this Court.

Mexico, Romania, Russia, and Turkey as economically comparable countries at the same level of economic development as China based on per capita 2019 Global National Income (GNI) data. Surrogate Country Mem. at Att. 1 (Oct. 18, 2021) (P.R. 96); PDM at 11.  Commerce preliminarily selected Malaysia as the surrogate country because Malaysia (1) "is at the same level of economic development as China," (2) "is a significant producer of comparable merchandise," and (3) "has reliable and usable data to value all {factors of production} and to calculate surrogate financial ratios."  PDM at 15; *see also id.* 11-15; Surrogate Country Mem. (P.R. 96).  In fact, of the countries on the OP List, Malaysia was the only net exporter of activated carbon during the period of review.  PDM at 12-14.

II.    In The Preliminary Results, Commerce Uses Malaysian Import Data Under HTS 2701.12 And HTS 2706.00 As The Surrogate Values For Jilin Bright's Inputs Of Bituminous Coal And Coal Tar Pitch, Respectively

On May 6, 2022, Commerce published the preliminary results, preliminarily determining that certain activated carbon from China was sold in the United States at less than normal value during the period of review.  *See* 87 Fed. Reg. at 27,094.  Because Jilin Bright was the only mandatory respondent with a weighted average dumping margin that was not zero, de minimis, or based entirely on facts available, Commerce "preliminarily assigned Jilin Bright's calculated rate as the separate rate for the non-examined separate rate respondents," PDM at 10, including Cherishmet and Yunguang.[3]

To determine normal value, Commerce used Malaysian import statistics as reported by the Global Trade Atlas (GTA) to value the raw materials, packing materials, and certain energy

---

[3]  Commerce preliminarily determined that the other mandatory respondent, Datong Juqiang, who is not a party to this case, did not sell subject merchandise at prices below normal value during the period of review.  PDM at 1.

inputs that the mandatory respondents used to produce the subject merchandise during the period

of review.   PDM at 24; Prelim. Surrogate Value (SV) Mem. at 2-3 (April 29, 2022) (P.R. 302).

Commerce determined that the GTA data were contemporaneous with the period of review,

publicly available, input-specific, tax-exclusive, and representative of a broad market average,

consistent with Commerce's preferences in selecting surrogate values.  PDM at 24.  Commerce

preliminarily valued Jilin Bright's bituminous coal using the Malaysian GTA data for bituminous

coal reported under HTS 2701.12, and valued Jilin Bright's coal tar using the Malaysian GTA

data for HTS 2706.  Prelim. SV Mem. at 4 (P.R. 302).

In its case brief, Jilin Bright contested Commerce's selection of Malaysian import data to

value Jilin Bright's bituminous coal and coal tar inputs, arguing that both values were

anomalous.  *See* IDM at 16-17, 24-25 (citations omitted).  Jilin Bright argued that Commerce

should have valued bituminous coal using import data under Malaysian HTS 2701.19 for "Other

Coal" rather than HTS 2701.12 for "Bituminous Coal."  IDM at 16-17 (citing Jilin Bright Case

Br. at 9-10 (July 11, 2022) (C.R. 220, P.R. 328)).  As for the coal tar input, Jilin Bright claimed

that Commerce should have valued coal tar using a report titled "The Coal Tar and Coal Tar

Pitch Market: Global Industry Analysis 2018-2021 and Forecast 2022-2028" (Global Coal Tar

and Pitch report) or using Russian import data for HTS 2706.00.  IDM at 24-25 (citing Jilin

Bright Case Br. at 5-8 (C.R. 220, P.R. 328)).

III.    In The Final Results, Commerce Continues To Use The Same Surrogate Values For Jilin
        Bright's Inputs Of Bituminous Coal And Coal Tar Pitch

On November 9, 2022, Commerce published the final results, calculating a weighted

average dumping margin of $0.62 per kilogram for Jilin Bright.  87 Fed. Reg. at 67,671.  Because

Jilin Bright's rate was the only rate that was not de minimis or based on facts available,

Commerce continued to use this rate for the unexamined separate rate respondents, including

Cherishmet and Yunguang.  *Id.*  In the final results, Commerce continued to rely on Malaysian import data to determine surrogate values for Jilin Bright's inputs of bituminous coal, IDM at 21-24, and coal tar, *id.* at 27-28, as discussed below.

    A.    <u>Bituminous Coal</u>

Commerce continued to value Jilin Bright's inputs of bituminous coal using Malaysian import data under HTS 2701.12 for "Bituminous Coal."  IDM at 21-24.  Commerce explained that "when selecting the best available information for valuing FOPs," its practice is to select "to the extent practicable, {surrogate values} which are product-specific, representative of a broad market average, publicly available, contemporaneous with the {period of review}, and tax- and duty-exclusive."  IDM at 21 (citing 19 U.S.C. § 1677b(c)(1)).  In applying that standard, Commerce assessed whether Jilin Bright's inputs satisfied the criteria established by Explanatory Note 2 of Chapter 27 for bituminous coal under HTS 2701.12, which requires (1) "a volatile matter limit (on a dry, mineral-matter-free basis) exceeding 14 percent," and (2) "a calorific value limit (on a moist, mineral-matter-free basis) equal to or greater than 5,833 kcal/kg."  IDM at 22 (citation omitted).[4]

Applying the criteria from Note 2, Commerce explained that the record contained "the required formulas . . . to determine both the volatile matter percentage and calorific values of the test samples provided by the mandatory respondents."  IDM at 22 (citing Petitioners' Post-Prelim. Rebuttal, at Exhibits 1 and 3 (June 24, 2022) (P.R. 324)).  To calculate the calorific value limit, Commerce first applied a formula to calculate the useful heat value (UHV) of Jilin Bright's inputs, and then used another equation to convert UHV to gross calorific value (GCV), the value

---

[4] *See* Datong Juqiang SV Submission, at Exhibit B (P.R. 115) (Ch. 27, Note 2); Datong Juqiang SV Submission, at Exhibit 3D (Nov. 15, 2021) (P.R. 119) (Harmonized Tariff Schedule, Chapter 27).

reflected in the HTS criteria.  On this basis, Commerce found that "all of Jilin Bright's . . . test samples meet the dual criteria under Note 2 of Chapter 27 of the HTS."  IDM at 23 (citations omitted).  In the final results, Commerce also rejected the argument that the Malaysian import data for HTS 2701.12 were "anomalous," explaining that "the record lacks sufficient benchmark data or other price information" showing that the data were "aberrantly high."  IDM at 21 (citation omitted).

       B.     <u>Coal Tar</u>

In the final results, Commerce continued to value Jilin Bright's coal tar input using "Malaysian import data under HTS 2706.00 (Mineral Tars, Including Reconstituted Tars)."  IDM at 27.  Commerce declined to value coal tar using the Global Coal Tar and Pitch report, "which does not explain the methodology used to obtain the prices it reports."  IDM at 28 (citing Datong Juqiang Final SV Submission, at Exhibit 3A (Mar. 30, 2022) (P.R. 230-233)).  Thus, Commerce could not "confirm {the} validity" of the report's prices, nor could it determine "how representative the prices are of a broad market average," or whether the prices "are tax- and duty-exclusive."  IDM at 28.  Commerce also rejected Jilin Bright's request to use Russian data under HTS 2706.00, IDM at 28, explaining its "strong preference to value all {factors of production} in a single surrogate country, pursuant to 19 CFR 351.408(c)(2)," IDM at 27.  Because Commerce had selected Malaysia as the primary surrogate country, Commerce's "first preference in selecting {surrogate value} data for this review is to utilize publicly available prices from Malaysia."  IDM at 27.

Finally, Commerce rejected the mandatory respondents' argument that the average unit value for Malaysian HTS 2706.00 was "aberrant," explaining that "there may be factors involved with pricing apart from the cost of manufacturing that impact a product's value and may cause a

product with less 'value-added' like coal tar pitch to be more expensive than another product." IDM at 27-28.  The mandatory respondents failed to demonstrate that allegedly higher prices for Malaysian HTS 2706.00 than HTS 2708.10 rendered the former values unreliable.  IDM at 27-28.

SUMMARY OF ARGUMENT

Commerce's valuation of Jilin Bright's inputs of bituminous coal and coal tar is lawful and supported by substantial evidence.  First, Commerce reasonably determined that Malaysian import data under HTS 2701.12 represent the best available information to value Jilin Bright's inputs of bituminous coal.  Note 2 of Chapter 27 establishes criteria for bituminous coal under HTS 2701.12, including a volatile matter limit and a calorific value limit.  [███████████ ████████████████████████████].  As to the calorific value limit, the record supports Commerce's finding that Jilin Bright's inputs satisfy this criterion, after applying the correct formula to convert UHV to GCV.  Although Jilin Bright now challenges Commerce's choice of formula for performing the conversion, Jilin Bright failed to dispute this issue at the agency level and, thus, failed to exhaust administrative remedies.  To the extent the Court nonetheless reaches the merits of the challenge, Commerce's choice of formula is supported by the record, and Jilin Bright has not demonstrated that Commerce was required to apply a different formula.  Moreover, Commerce reasonably determined that the Malaysian import value under HTS 2701.12 is not aberrantly high.

Second, Commerce's determination to value Jilin Bright's coal tar pitch using the average unit value of Malaysian imports under HTS 2706 is likewise supported by substantial evidence.  Commerce found that Malaysian import data under HTS 2706 are product-specific, representative of a broad market average, publicly available, contemporaneous with the period of

review, and tax- and duty-exclusive—consistent with Commerce's surrogate value preferences. Substantial evidence supports Commerce's refusal to use data from the Global Coal Tar and Pitch report because that report does not explain its methodology for obtaining the prices it reports, preventing Commerce from confirming the validity of those prices. Absent such information, Commerce could not determine whether the report's prices satisfy Commerce's preferences for data representing a broad market average, exclusive of taxes and duties. Additionally, Commerce reasonably applied its strong preference to value all factors of production from a single country and thus declined Jilin Bright's proposed alternative of using Russian import data under HTS 2706 to value coal tar. Finally, as with the surrogate value for bituminous coal, Commerce reasonably determined that Malaysian import data under HTS 2706.00 are not anomalous.

In focusing on alleged imperfections of Commerce's surrogate value selections, plaintiffs fail to recognize that Commerce's selections need not be perfect under the governing standard. Plaintiffs' arguments in favor of alternative datasets and formulas merely reflect disagreements with Commerce's lawful exercise of its discretion to weigh the evidence, and, thus, are meritless.

<u>ARGUMENT</u>

I.   <u>Legal Standards</u>

   A.   <u>Standard of Review</u>

The Court upholds Commerce determinations that are supported "by substantial evidence on the record" and otherwise "in accordance with law{.}" 19 U.S.C. § 1516a(b)(1)(B)(i). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" means "more than a mere

scintilla" of evidence that "a reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (internal quotation marks and citations omitted).  Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).  An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

   B.   Surrogate Value Selection

   The antidumping duty statute provides for the application of remedial duties to foreign goods sold, or likely to be sold, in the United States "at less than its fair value."  19 U.S.C. § 1673.  Once Commerce issues an antidumping duty order, the agency conducts administrative reviews to determine the dumping margin for each entry subject to the review.  19 U.S.C. § 1675(a)(1), (2)(A)(ii).  A dumping margin is the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'"  *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)) (internal footnotes omitted).

   When an antidumping duty proceeding involves a nonmarket economy country, Commerce generally "determines normal value by valuing the factors of production in a surrogate country," using values "referred to as 'surrogate values.'"  *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1352 (Ct. Int'l Trade 2018) (citing 19 U.S.C. § 1677b(c)(1)).  "The factors of production include, but are not limited to: '(A) hours of labor

required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities

consumed, and (D) representative capital cost, including depreciation.'" *Id.* at n.12 (citing 19

U.S.C. § 1677b(c)(3)). Commerce uses this framework "to construct a hypothetical market

value" of the subject merchandise in the non-market economy country. *Nation Ford Chem. Co.*

*v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

"The statute directs Commerce to value the factors of production through 'the best

available information' in the market economy." *Jiaxing Bro. Fastener Co. v. United States*, 822

F.3d 1289, 1293 (Fed. Cir. 2016) (quoting 19 U.S.C. § 1677b(c)(1)). The statute does not define

the phrase "best available information," leaving Commerce with "broad discretion" to determine

what constitutes the best available information. *QVD Food Co. v. United States*, 658 F.3d 1318,

1323 (Fed. Cir. 2011) (citing, *e.g.*, *Nation Ford Chem. Co.*, 166 F.3d at 1377). In filling the

statutory gap, Commerce considers the criteria set forth in its "Policy Bulletin 04.1," including

the preference to value all factors of production from a single surrogate country. *See* Import

Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection

Process;[5] 19 C.F.R. § 351.408(c)(2). To the extent practicable, Commerce selects surrogate

values that are product-specific, representative of a broad-market average, publicly available,

contemporaneous with the period of review, and tax- and duty-exclusive. IDM at 27.

Commerce has not identified a hierarchy among these factors, and weighs the available

information to make a product-specific and case-specific decision regarding the best information

for each input. *See* IDM at 27 (citations omitted).

---

[5] Available at https://enforcement.trade.gov/policy/bull04-1.html (last visited Dec. 4, 2022).

II.    Commerce's Determination To Value Jilin Bright's Bituminous Coal Using Malaysian
Import Statistics Under HTS 2701.12 Is Supported By Substantial Evidence

In the final results, Commerce valued Jilin Bright's bituminous coal input using

Malaysian import data under HTS 2701.12, finding that Jilin Bright's inputs satisfied the criteria

established by Note 2 of Chapter 27 for bituminous coal.  IDM 21-24; *see also Carbon Activated

Tianjin Co. v. United States*, -- F. Supp. 3d -- , 2023 WL 4678995, at *14 (Ct. Int'l Trade, July

21, 2023) (discussing the criteria required by Note 2).  To evaluate whether Jilin Bright's inputs

of bituminous coal satisfied the calorific value limit criteria in Note 2, Commerce applied a

formula to convert UHV to GCV.[6]  IDM at 22-23.  Specifically, Commerce used the formula

"GCV = (UHV + 3645 -75.4 M) / 1.466," in which "3645 is a constant and 'M' is an inherent

moisture level of five percent."  IDM at 23 (citing Pet'r Post Prelim. Rebuttal, at Exhibits 1 and 3

(P.R. 324)).

Before this Court, Jilin Bright challenges Commerce's use of this formula, and argues

that Commerce instead should have used Malaysian import data under HTS 2701.19 for "Other

Coal."  *See* Jilin Bright Br. at 9-16.  As discussed below, however, Jilin Bright failed to exhaust

administrative remedies regarding the correct formula to calculate the calorific value limit of its

bituminous coal and, thus, may not raise the argument for the first time before this Court.  To the

extent the Court nonetheless reaches the merits of Jilin Bright's new argument, substantial

evidence supports Commerce's selection and application of the chosen formula, and resulting

determination that HTS 2701.12 is product-specific to Jilin Bright's inputs of bituminous coal.

---

[6]  The other criterion under Note 2 requires "a volatile matter limit (on a dry, mineral-
matter-free basis) exceeding 14 percent."  IDM at 22 (citation omitted).  [███████████
███████████████████████████████████████████████████████████████████
█].  *See* Jilin Bright Br. at 13.

Commerce also reasonably determined that Jilin Bright failed to show that the Malaysian import data under HTS 2701.12 are aberrantly high.

A.    Jilin Bright Failed To Exhaust Its Challenge To Commerce's UHV-To-GCV Conversion Formula

Jilin Bright had the opportunity before Commerce to argue the correct formula to convert UHV to GCV, but failed to do so, and thus failed to exhaust its administrative remedies before the agency. *See Jilin Bright Br.* at 11-16. This Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "This statutory mandate 'indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.'" *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). By regulation, interested parties must raise in their case brief all arguments that remain "relevant" to Commerce's "final determination or final results." *Corus Staal BV*, 502 F.3d at 1378 (citing 19 U.S.C. § 351.309(c)(2)). Interested parties must exhaust administrative remedies with respect to all issues that they have notice may be decided by Commerce in its final determination or final results. *See also Boomerang Tube* LLC, 856 F.3d at 913 (requiring exhaustion of administrative remedies even when Commerce changes its reasoning from the preliminary determination, so long as parties knew or should have known that Commerce may consider the issue in the final determination).

At the time Jilin Bright submitted its case brief, it had notice that Commerce would evaluate the correct formula to convert UHV to GCV in the final results, and that one of the formulas under consideration was "GCV = (UHV + 3645 – 75.4 M) / 1.466." In the preliminary results, Commerce explained that the criteria in Note 2 "were written using the Gross Calorific Value (GCV), and not UHV, as the measurement for heat value." PDM at 26 (citing Petitioners'

13

SV Cmts, at 8-9 (Mar. 31, 2022) (C.R. 161; P.R. 250); Petitioners' SV Exhibits, Exhibit SVF-I.C, (Mar. 31, 2022) (C.R. 162; P.R. 251)).  However, Commerce explained that it could not determine "whether the mandatory respondents' bituminous coal GCV is above or below 5,833 kcal/kg using the information on the record."  PDM at 26.  Although the record contained a formula for determining the UHV value of mandatory respondents' inputs, PDM at 26, Commerce indicated that it would request information from the parties regarding "the GCV calculation" to be used in the final results.  PDM at 27.  Commerce stated that it intended "to request clarification and/or additional information from the parties on the GVC calculation and how the information identified in the mandatory respondents' test reports can be used to calculate the GCV of their bituminous coal input."  PDM at 27.

On June 24, 2022, petitioners placed on the record an article by Saurabh Priyadarshi titled the "Calorific Value of Coal" (the Priyadarshi article), containing equations to convert between UHV, GCV, and net caloric value (NCV), including the equation ultimately used by Commerce, "GCV = (UHV + 3645 – 75.4 M) / 1.466."  *See* Petitioners' Post-Prelim. Rebuttal, at Exhibit 1, at 6 (P.R. 324).  Petitioners argued that the Priyadarshi article "provides the correct formula for establishing GCV from UHV."  *Id.* at 4.

Thus, by the time Jilin Bright submitted its case brief, it had notice that Commerce intended to address the correct equation to convert UHV to GCV in the final results, and that one potential equation was "GCV = (UHV + 3645 – 75.4 M) / 1.466," from the Priyadarshi article.  Nevertheless, Jilin Bright failed to raise in its case brief any of its current arguments challenging the use of this formula.  *See generally* Jilin Bright Case Br. (C.R. 220, P.R. 328).  Nowhere in its

case brief did Jilin Bright argue that the proposed GCV conversion formula in the Priyadarshi article was unreliable.

Indeed, no party challenged the GCV conversion formula from the Priyadarshi article before Commerce. Although Datong Juqiang mentioned the formula in its case brief, it argued in *favor* of the formula "GCV = (UHV + 3645 – 75.4 M) / 1.466"—explaining that the formula could be used to convert UHV heat value to GCV. Datong Juqiang Case Br. at 12 (July 11, 2022) (C.R. 221, P.R. 329). Datong Juqiang cited the formula as one of "two choices to derive {Datong Juqiang's} coal input's GCV from its UHV." *Id.*; *see also* IDM at 15-16 (reciting Datong Juqiang's argument in favor of the formula). Jilin Bright's case brief adopted the arguments made by Datong Juqiang. Jilin Bright Case Br. at 10 (C.R. 220, P.R. 328) (stating that it "incorporate{d} by reference the arguments made by Datong Juqiang" to the extent relevant "to the calculation of the antidumping margin for Jilin Bright"). Thus, far from exhausting Jilin Bright's current challenge to the formula before Commerce, Datong Juqiang (and by extension, Jilin Bright) endorsed the very formula that Jilin Bright now disputes.

Datong Juqiang's endorsement of Commerce's chosen formula—GCV = (UHV + 3645 – 75.4 M) / 1.466—is particularly notable given Datong Juqiang's challenge to a different conversion methodology advanced by petitioners. In its case brief, Datong Juqiang challenged a "dynamic formula" advocated by petitioners to convert UHV to GCV, based on the Coal India Limited Report.[7] Datong Juqiang Case Br. at 12 (July 11, 2022) (C.R. 221, P.R. 329). Datong Juqiang argued that this dynamic formula was "an 'arbitrary' method that applies multiple

---

[7] Petitioners' Resp. to Inquiry, at 2 (May 17, 2022) (P.R. 307) (citing Petitioners' SV Exhibits, Part I, at Exhibit SVF-I.B.1 (Mar. 31, 2021) (P.R. 251); Datong Juqiang Supp. Sec. D Exhibits, at Exhibit SD-22 (Mar. 18, 2022) (P.R. 222); Jilin Bright Supp. Sec. D. Resp., at Exhibit SD-7.2 (Mar. 22, 2023) (P.R. 226)) (offering equations based on the Coal India Limited Report).

conversion factors depending on the initial UHV value of coal." *Id.*  Datong Juqiang also argued

that "the CIL {Coal India Limited} methodology is not realistic since it measures GCV based on

a theoretical assumption of 5% moisture level in a coal sample." *Id.* (citing Petitioners' Resp. to

Inquiry, at 4 (May 17, 2022) (P.R. 307).  However, neither Datong Juqiang nor Jilin Bright

challenged the 5 percent inherent moisture level reflected in the GCV conversion equation from

the Priyadarshi article.  *See generally* Datong Juqiang Case Br. (July 11, 2022) (C.R. 221, P.R.

329); Jilin Bright Case Brief at 10 (C.R. 220, P.R. 328).[8]  Because Jilin Bright failed to exhaust

administrative remedies with respect to its current challenge to Commerce's chosen formula to

convert UHV values to GCV values, the Court should decline to entertain Jilin Bright's new

argument.  *See Boomerang Tube*, 856 F.3d at 913.

Further, the Court should decline to consider Jilin Bright submission of an entirely new

chart never provided to Commerce.  Jilin Bright Br. at 14-15.  Jilin Bright offers a table that it

characterizes as "adapted from Jilin Bright's Third Supplemental, Exhibit S3-2, C.R. 215." *Id.* at

14.  This "adapted" table purports to "summarize{} the results if an intrinsic moisture of 8.3

percent is assumed." *Id.* at 14.  However, "the focal point for judicial review should be the

administrative record already in existence, not some new record made initially in the reviewing

court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Thus, the Court should decline to consider the

newly submitted factual information that was not included in the administrative record or

exhausted before the agency.

---

[8]  Jilin Bright and Datong Juqiang were on notice that the GCV conversion equation from
the Priyadarshi article reflected "inherent moisture levels, which for {the referenced}
calculations are set at a constant 5 percent."  Petitioners' Post-Prelim. Rebuttal at 4, Exhibit 1, at
6 (P.R. 324) (citing a chart reflecting "Gross Calorific Value GCV . . . at 5% moisture level").

B.     Substantial Evidence Supports Commerce's Use Of The GCV Conversion
       Formula

Even if the Court entertains Jilin Bright's challenge to Commerce's chosen formula,

substantial evidence supports Commerce's use of the GCV conversion formula, GCV = (UHV +

3645 – 75.4 M) / 1.466, and the resulting determination that Jilin Bright's inputs of bituminous

coal satisfy the calorific value limits in Note 2.  *See* IDM at 23.  Jilin Bright challenges

Commerce's reliance on this formula, claiming that the formula's assumption of an inherent

moisture level of five percent is unsupported by the record, and that Commerce should have used

other formulas preferred by Jilin Bright.  Jilin Bright Br. at 15-16.  As discussed below,

Commerce's choice of formula is supported by substantial evidence.

Determining the correct formula to apply when classifying an input for subject

merchandise is a technical question delegated to Commerce, as the agency charged with

implementing the antidumping duty laws.  "Antidumping and countervailing duty determinations

involve complex economic and accounting decisions of a technical nature, for which agencies

possess far greater expertise than courts."  *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v.*

*Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374–75 (Fed. Cir. 2021) (quoting *Fujitsu Gen. Ltd. v.*

*United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996)).  "This deference is both greater than and

distinct from that accorded the agency in interpreting the statutes it administers, because it is

based on Commerce's technical expertise in identifying, selecting and applying methodologies to

implement the dictates set forth in the governing statute."  *Id.* (quoting *Fujitsu*, 88 F.3d at 1039).

It is Commerce's role to "weigh the available information with respect to each input value and

make a product-specific and case-specific decision as to what the 'best' {surrogate value} is for

each input."  IDM at 21 (citing *Polyethylene Terephthalate Film, Sheet, and Strip from China:*

*Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 55,039 (Dep't of

Commerce, Sept. 24, 2008), and accompanying IDM, at Comment 2).

In this case, the record contained multiple different formulas and methodologies for

measuring the calorific value limit for the relevant inputs. *Compare* Petitioners' Post-Prelim.

Rebuttal at 2-4, Exhibits 1 and 3 (P.R. 324) (presenting documentation supporting the GCV

conversion formula, GCV = (UHV + 3645 – 75.4 M) / 1.466); Petitioners' Resp. to Inquiry, at 4

(May 17, 2022) (P.R. 307) (arguing for a "dynamic" formula based on the Coal India Limited

Report); IDM at 15, 22 (discussing Datong Juqiang's proposal to use the formula "GCV = 1.053

x NCV") (citation omitted). Selecting among these various formulas is a "complex" decision "of

a technical nature" in which Commerce possesses "far greater expertise than courts." *See*

*Borusan Mannesmann*, 5 F.4th at 1374–75.

Commerce's choice of formula is supported by record evidence, and should be sustained.

As an initial matter, Commerce explained that the first step of in determining whether Jilin

Bright's inputs satisfied this criterion is to "determine the UHV heat values" for those inputs.

IDM at 23. To do so, Commerce "must use the ash and moisture test samples in their original or

'as received conditions and apply the formula":

UHV = 8900 - 138(Ash Content + Moisture Content)

IDM at 23 (citing Petitioners' Post-Prelim. Rebuttal, at Exhibits 1 and 3 (P.R. 324)). Jilin Bright

does not contest the formula that Commerce used to convert the "as received" test samples to

UHV heat values. Next, Commerce applied another formula to convert the UHV value to GCV:

GCV = (UHV + 3645 -75.4 M) / 1.466

IDM at 23 (citing Petitioners' Post-Prelim. Rebuttal, Exhibits 1 and 3 (P.R. 324). Substantial

evidence supports Commerce's reliance on this formula, which is listed in the Priyadarshi article

as a method to convert between UHV and GCV.  Petitioners' Post-Prelim. Rebuttal, Exhibit 1 at

6 (P.R. 324).

Jilin Bright nonetheless argues that the "multiple formulas" on the record demonstrate

"that there is no authoritative formula for expressing the GCV."  Jilin Bright Br. at 15-16 (citing,

*e.g.*, "GCV = 2111 + 0.6812 x UHV"); *see also* Petitioners' Post-Prelim. Rebuttal, Exhibit 1 at 6

(P.R. 324).  But the possibility of drawing different conclusions from the record does not

undermine the substantial evidence in support of Commerce's finding.  *Consolo*, 383 U.S. at

620.  The fact that Commerce's chosen formula was endorsed by Datong Juqiang —another

mandatory respondent—provides further support for Commerce's reasoning.  *See* Datong

Juqiang Case Br. at 12 (C.R. 221, P.R. 329) (listing "GCV = (UHV + 3645 – 75.4 M) / 1.466" as

one of Commerce's "two choices to derive {Datong Juqiang's} coal input's GCV from its

UHV").

Jilin Bright further contends that "Commerce selected the formula that generated the

highest GCVs as compared to either of the other formulas without explanation why its selected

formula yields the most accurate results."  Jilin Bright Br. at 16.  To the contrary, Commerce

explained its decision to reject the alternative formulas proposed by the mandatory respondents.

*See* IDM at 22; *see also* Datong Juqiang Case Br. (C.R. 221, P.R. 329).  For example, Commerce

"reject{ed} Datong Juqiang's claim that Commerce may use the formula 'GCV = 1.053 × NCV'

to convert UHV to GCV," because "NCV and UHV are not equivalent terms."  IDM at 22 (citing

Datong Juqiang SV Cmts., Pt. 1, at Exhibit 2C (Mar. 30, 2022) (P.R. 230)).  As Commerce

explained in the IDM, "UHV is directly calculated from a non-laboratory test sample for coal on

'as received' basis, based on only the percentage of ash and moisture content, whereas NCV is

established under laboratory conditions."  IDM at 22 (citing Petitioners' Final SV Submission at

Exhibit SVF-I.D.2 (Mar. 31, 2022) (P.R. 251)).  Furthermore, the record contains formulas for

converting between UHV, GCV, and NCV, confirming that UHV and NCV are not the same.

*Id*.; *see also* Petitioners' Post-Prelim. Rebuttal, Exhibit 1 at 6 (June 24, 2022) (P.R. 324)

(containing equations to convert between UHV, GCV, and NCV).

 Commerce also rejected "Datong Juqiang's assertion that the heat value in Note 2 of

Chapter 27 must be based on NCV instead of GCV," finding that Datong Juqiang's claim that

"the Malaysian government and international organizations rely on NCV for their calculations"

to be "unsupported by the record."  IDM at 22; *see also* Datong Juqiang Case Br. at 6-8 (C.R.

221, P.R. 329).  Thus, contrary to Jilin Bright's claims, Commerce reasonably explained its

rationale for declining to adopt alternative formulas for determining the calorific value limit for

inputs of bituminous coal.  *See* IDM at 22.

 Jilin Bright maintains that Commerce should have "continued to use the formula it

suggested in the post-preliminary results supplemental questionnaire of "GCV = 1.053 * UHV,"

contending this formula is supported by the International Energy Agency.  Jilin Bright Br. at 15.

In making this argument, Jilin Bright refers to the formula GCV = 1.053 x NCV, which Datong

Juqiang had proposed to Commerce as "prescribed by {the} International Energy Agency."  *See*

IDM at 15 (citing Datong Juqiang's Final SV Rebuttal Comments, at 8, Exhibits 3A, at 15; 3B,

at 3; and 3C (Apr. 18, 2022) (P.R. 283-284)) (explaining that Datong Juqiang advocated "a

conversion formula prescribed by International Energy Agency (IEA) (*i.e.*, NCV = 95% of GCV

for coal)," which equals "the conversion formula 'GCV = 1.053 NCV'").  Again, however,

Datong Juqiang's formula provides a conversion between GCV and NCV, not between GCV and

UHV.  To adopt this formula to convert from UHV to GCV, UHV and NCV would have to be

the same.  IDM at 22.  As discussed above, Commerce explicitly rejected such reasoning,

explaining that "NCV and UHV are not equivalent terms."  IDM at 22.  Accordingly, Jilin

Bright's preferred formula for converting UHV to GCV—using the formula GCV = 1.053 x

UHV—is unsupported by the record.

Jilin Bright further contends that Commerce erred in applying the "five percent intrinsic

moisture assumption" incorporated in the formula, GCV = (UHV + 3645 -75.4 M) / 1.466.  Jilin

Bright Br. at 13-14.  Yet substantial evidence supports the use of a 5 percent inherent moisture

figure when calculating GCV.  For example, Table 7 in the Priyadarshi article references the

"Gross Calorific Value GCV . . . *at 5% moisture level*."  Petitioners' Post-Prelim. Rebuttal,

Exhibit 1 at 6 (P.R. 324) (emphasis added).  Additional sources—including those submitted by

Datong Juqiang and Jilin Bright—contain similar references to "Gross Calorific Value GCV

(Kcal/Kg) (*at 5% moisture level*)."  *See* Petitioners' Resp. to Inquiry, at 2 (May 17, 2022) (P.R.

307) (citing Petitioners' SV Exhibits, Part I, at Exhibit SVF-I.B.1 (Mar. 31, 2021) (P.R. 251);

Datong Juqiang Supp. Sec. D Exhibits, at Exhibit SD-22 (Mar. 18, 2022) (P.R. 222); Jilin Bright

Supp. Sec. D. Resp., at Exhibit SD-7.2 (Mar. 22, 2023) (P.R. 226)) (emphasis added).

Jilin Bright also argues that "{t}here is no evidence to indicate that the intrinsic moisture

reported in Table 6 . . . is representative of Jilin Bright's coal."  Jilin Bright Br. at 14.  Not only

was this argument never raised to Commerce, but it fails to undermine the substantial evidence in

the record supporting Commerce's application of the GCV conversion at the "5% moisture

level."  *See, e.g.*, Petitioners' Post-Prelim. Rebuttal, Exhibit 1 at 6 (P.R. 324).  In light of the

numerous references to the "5% moisture level" associated with conversion to GCV, the record

contains "such relevant evidence as a reasonable mind might accept as adequate to support" the

conclusion that the GCV formula uses a default moisture value of 5 percent.  *See PAM, S.p.A. v.*

*United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citation omitted).

Finally, Jilin Bright is incorrect that HTS 2701.12 is not "product specific."  Jilin Bright

Br. at 9.  As explained above, substantial evidence supports Commerce's finding that Jilin

Bright's inputs of bituminous coal satisfy both criteria under Note 2 of Chapter 27, associated

with HTS 2701.12 for bituminous coal.  IDM at 23-24.  Accordingly, Commerce reasonably

determined that the HTS classification for bituminous coal under HTS 2701.12 is more product-

specific than the catch-all category of HTS 2701.19 for "Other Coal."

      C.      Commerce Reasonably Determined That The Malaysian Import Data For HTS 2701.12 Are Not Aberrant

Commerce determined that the Malaysian import data for HTS 2701.12 provide the best

information available to value Jilin Bright's inputs of bituminous coal, and that Jilin Bright failed

to demonstrate that the Malaysian import data for HTS 2701.12 are aberrant.  IDM at 21.  Jilin

Bright challenges this determination, claiming that HTS 2701.12 "reflects anomalous values."

Jilin Bright Br. at 9-11.  Substantial evidence supports Commerce's findings.

As Commerce explained in the final results, Commerce's practice when valuing an input

"is to assess all relevant price information on the record, including any appropriate benchmark

data."  IDM at 21 (citing, *e.g.*, *Carbazole Violet Pigment 23 from China: Final Results of*

*Antidumping Duty Administrative Review*, 75 Fed. Reg. 36,630 (Dep't of Commerce, June 28,

2010), and accompanying IDM at Comment 4).  "Regarding benchmarking, Commerce

'examines historical import data for the potential surrogate countries for a given case, to the

extent such import data are available.'"  IDM at 21 (quoting *Certain Activated Carbon from*

*China: Final Results of Antidumping Duty Administrative Review; 2013-2014* (*CAC from China,*

*2013-2014*), 80 Fed. Reg. 61,172 (Dep't of Commerce, Oct. 9, 2015), and accompanying IDM at

26).  Alternatively, Commerce "examines data from the same {Harmonized Tariff System}

category for the primary surrogate country over multiple years to determine if the current data

appear aberrational compared to historical values."  IDM at 21 (quoting *CAC from China, 2013-

2014*, 80 Fed. Reg. 61,172).  "Merely appearing on the low or high end of a range of values is

not enough to make data aberrational." IDM at 22 (quoting *CAC from China, 2013-2014*, 80 Fed.

Reg. 61,172); *see also Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1344, 1350 (Ct.

Int'l Trade 2020) (citing *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1365 (Ct.

Int'l Trade 2018)).  Applying these standards, Commerce explained that "the record lacks

sufficient benchmark data or other price information demonstrating that the Malaysian import

data reported under HTS 2701.12 are aberrantly high."  IDM at 21.

Jilin Bright challenges Commerce's finding as "conclusory," and contends that the

Malaysian average unit values for coking and non-coking coal covered by HTS 2701.12 reflect

an inverse price relationship compared to international prices and the U.S. Energy Information

Annual Coal Report 2020.  Jilin Bright Br. at 9-10.  However, Jilin Bright fails to identify any

benchmark data demonstrating that the Malaysian data are aberrant pursuant to Commerce's

usual standards. *See* IDM at 21.  Moreover, far from being conclusory, "the path of Commerce's

decision {is} reasonably discernable to a reviewing court."  *NMB Singapore Ltd. v. United

States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).  Commerce explained its usual practice for

assessing whether surrogate value data is aberrant, including consideration of historical import

prices and a comparison with values from countries on the OP List.  *See* IDM at 21.  Applying

these standards, Commerce explained that "the record lacks sufficient benchmark data or other

price information demonstrating that the Malaysian import data reported under HTS 2701.12 are

aberrantly high." IDM at 21. Substantial evidence supports this determination. *See, e.g.*, Datong Juqiang SV Cmts, Pt. 1, Exhibit 3A(i) (Nov. 15, 2021) (P.R. 115) (providing data for HTS 2701.12 and 2701.19 for different countries on the OP List). Thus, Commerce's decision reflects the conclusion that Jilin Bright failed to satisfy its burden to show aberrant pricing under Commerce's usual practice for analyzing that issue.

In reviewing Commerce's surrogate value selection for bituminous coal, the Court must not "evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation omitted). That principle applies particularly "{w}hen all the available information is flawed in some way," leaving Commerce to "make a judgment call as to what constitutes the 'best' information." *Lifestyle Enterprise, Inc. v. United States*, 751 F.3d 1371, 1378 (Fed. Cir. 2014). Because "a reasonable mind could conclude" that HTS 2701.12 was the best available information to value Jilin Bright's inputs of bituminous coal, and was not aberrantly high, the Court should sustain Commerce's determination. *See Zhejiang DunAn Hetian Metal Co.,* 652 F.3d at 1341.

III.   Commerce's Use Of Malaysian Import Data Under HTS 2706.00 As The Surrogate Value For Jilin Bright's Coal Tar Pitch Input Is Lawful And Supported By Substantial Evidence

Commerce valued Jilin Bright's inputs of coal tar pitch using Malaysian data under HTS 2706.00. IDM at 27-28. Jilin Bright argues that the Malaysian import data for HTS 2706.00 are not product specific and are aberrantly high, and that Commerce instead should have valued the input using data from the Global Coal Tar and Pitch Report. Jilin Bright Br. at 19. In the alternative, Jilin Bright argues that Commerce should have used the average unit values for

Russian import data under HTS 2706.  Both arguments are unpersuasive and Commerce's use of

Malaysian import data under HTS 2706.00 is lawful and supported by substantial evidence.

    A.    Substantial Evidence Supports Commerce's Determination That Malaysian Import Data Under HTS 2706.00 Are Product-Specific, Representative Of A Broad Market Average, And Tax- And Duty-Exclusive

Commerce reasonably determined that Malaysian import data under HTS 2706.00 are the

best available information for valuing Jilin Bright's inputs of coal tar.  Commerce explained that

Malaysian import data from the Global Trade Atlas are representative of a broad market average,

publicly available, and contemporaneous with the period of review.  Prelim. SV Mem. at 4 (P.R.

302), *unchanged in* Final SV Mem. (Nov. 3, 2022) (P.R. 346).  Consistent with its preference for

values that are tax- and duty-free, Commerce disregarded "import prices from countries that it

has reason to believe, or suspect may be dumped or subsidized," and also "disregarded prices

from {non-market economy} countries."  Prelim. SV Mem. at 4 (P.R. 302) (citation omitted).

Moreover, the Malaysian import data were from Commerce's primary surrogate country of

Malaysia, consistent with Commerce's strong preference for data from the primary surrogate

country.  *See* IDM at 27.

Substantial evidence also supports Commerce's determination that the Malaysian import

data under 2706.00 are product-specific.  The HTS classification for 2706 covers "tar distilled

from coal, from lignite or from peat, and other mineral tars, whether or not dehydrated or

partially distilled, including reconstituted tars."  *See* Datong Juqiang SV Cmts, Pt. 10, at Exhibit

5B, (Nov. 15, 2021) (P.R. 124).  Jilin Bright does not dispute that, among the HTS

classifications, HTS 2706.00 is specific to coal tar.  Indeed, Jilin Bright contends that HTS

2706.00 is the correct classification for its inputs with respect to Russian import data, Jilin Bright

Br. at 23-24, and argued to Commerce that "Russian HTS 2706.00 affords the *most reliable*"

surrogate value available on the record, Datong Juqiang Case Br. at 21 (C.R. 221, P.R. 329)

(emphasis added); Jilin Bright Case Br. at 10 (C.R. 220, P.R. 328) (incorporating by reference

Datong Juqiang's arguments "relate{d} to the calculation of the antidumping margin for Jilin

Bright"). That Jilin Bright advocated for Commerce to use the Russian import data under HTS

2706.00 to value its inputs of coal tar supports the determination that the HTS 2706.00

classification is product-specific.

Nonetheless, Jilin Bright now contends that the average unit value of Malaysian import

data under HTS 2706 "is a basket category and not specific to the factor that Commerce is

attempting to value." Jilin Bright Br. at 19. Jilin Bright maintains that the Global Coal Tar and

Pitch report "provides more specific pricing information related to the input being evaluated

compared to the Malaysian AUV classified under HTS 2706." Jilin Bright Br. at 17

(capitalization altered). However, Commerce reasonably declined to value coal tar using the

Global Coal Tar and Pitch report because the report "does not explain the methodology used to

obtain the prices it reports." IDM at 28 (citing Datong's Final SV Submission at Exhibit 3A

(Mar. 30, 2022) (P.R. 230-233)). Thus, Commerce could not "confirm {the} validity" of its

prices, "determine how representative the prices are of a broad market average," or evaluate

whether the prices "are tax- and duty-exclusive." *Id.*; *see also* IDM at 27 (explaining

Commerce's preference for data that are "tax- and duty-exclusive" and representing a broad

market average) (citation omitted).

Jilin Bright challenges Commerce's finding that the Global Coal Tar and Pitch report

does not explain its pricing methodology, arguing that the report contains "Chapter 3, titled

'Research Methodology,' which "explained the research methodology in considerable detail."

Jilin Bright Br. at 17. Yet Jilin Bright's insistence that the report contains *some* explanation of

pricing methodology does not undermine Commerce's determination that the report lacks

sufficient information for Commerce to "determine how representative the prices are of a

broad market average" or whether they are "tax- and duty-exclusive."  IDM at 28.  Commerce

reasonably opted for Malaysian import data that satisfy these preferred criteria.

>   B.   Substantial Evidence Supports Commerce's Determination That The Malaysian
>        Import Data Under HTS 2706 Are Not Aberrant

Substantial evidence also supports Commerce's determination that the Malaysian import

data under HTS 2706.00 are not aberrant.  IDM at 28.  This Court recently rejected similar

arguments arising from the thirteenth review of the same order.  *See Carbon Activated Tianjin

Co.*, -- F. Supp. 3d -- , 2023 WL 4678995, at *9 (finding "that Commerce supported its reliance

on Malaysian import data under HTS 2706.00 with substantial evidence" and rejecting

arguments that the data were "aberrant").

In this review, Commerce explained that the mandatory respondents had not satisfied

Commerce's usual criteria for showing a value to be aberrational.  As discussed above,

"Commerce prefers to have historical data on the record" to evaluate "whether a value is

aberrational."  IDM at 28 (citing *Pure Magnesium from China: Final Results of Antidumping

Duty Administrative Review; 2011–2012*, 79 Fed. Reg. 94 (Dep't of Commerce, Jan. 2, 2014),

and accompanying IDM at Comment 2).  In the past, Commerce has also "compared the alleged

aberrational value with values from countries" on the OP List.  IDM at 28 (citing, *e.g.*, *Certain

Activated Carbon from China: Final Results of Antidumping Duty Administrative Review; 2016-

2017*, 83 Fed. Reg. 53,214 (Dep't of Commerce, Oct. 22, 2018), and accompanying IDM at

Comment 4).  Commerce thus compared the Malaysian import data for HTS 2706.00 with data

from other countries on the OP List.  For example, compared to the largest average unit value for

coal tar among the countries on the OP List—2.82 USD/kg from Romania—"the Malaysian

import value of coal tar is approximately 44 percent of the largest coal tar import AUV." IDM at 28 (citing Datong Juqiang's SV Submission at Exhibit 5A(i) (Nov. 15, 2021) (P.R. 124)). Commerce determined "that the Malaysian {average unit value} is not aberrantly high or low compared to the values" for other countries on the OP List. IDM at 28 (citing Datong Juqiang's SV Submission at Exhibit 5A(i) (P.R. 124)).

Jilin Bright nonetheless claims that the Malaysian import data are "unreliable and anomalous." Jilin Bright Br. at 21. Relying on the Global Tar and Pitch report, Jilin Bright claims that the "evidence demonstrates that coal tar pitch is more expensive than coal tar," but that the "the reverse relationship exists in the Malaysian import data." *Id.* at 20-21 (citing, *e.g.*, Datong Juqiang First SV Comments, at Exhibit 5Q at 32 (P.R. 133) (Global Coal Tar and Pitch report)). This argument, however, rests on the Jilin Bright's claim that the average unit value under HTS 2708.10 should be higher than HTS 2706.00—based on comparisons with prices from the Global Coal Tar and Pitch report. IDM at 27-28. In the thirteenth administrative review of the same order, this Court found that plaintiffs "did not provide evidence to support their inference that the higher value-added product necessarily should be priced higher on the same per weight basis." *Carbon Activated Tianjin Co*., -- F. Supp. 3d -- , 2023 WL 4678995, at *9. In this review, likewise, Commerce could not confirm the validity of the prices in the Global Coal Tar and Pitch report, nor whether those prices complied with Commerce's preferences for data representing a broad market average and tax- and duty-exclusive prices. IDM at 28. Thus, Commerce explained that it did "not have publicly available domestic prices on the record to use as a comparison with import {average unit values}." IDM at 28. In other words, "the Malaysian domestic purchases for coal tar or pitch found in the Global Coal Tar and Pitch report" could not serve as "a suitable comparative

benchmark" for assessing the reliability of Malaysian import data under HTS 2706.00.  IDM at 28.

Moreover, even if Jilin Bright could show that the average unit value of pitch is normally higher than that of coal tar, Commerce explained that pricing considerations other than the cost of manufacturing "may cause a product with less 'value added,' like coal tar, to be more expensive than another product."   IDM at 27-28.  Thus, Jilin Bright failed to show "that the higher {average unit value} for Malaysian HTS 2706.00 than Malaysian HTS 2708.10 distorts its reliability" as a surrogate value.  IDM at 27.

C.      Commerce Reasonably Rejected Jilin Bright's Proposed Alternatives

Commerce reasonably declined to use Jilin Bright's proposed alternatives to value its coal tar inputs using the Global Coal Tar and Pitch report or Russian import data under HTS 2706.00.  *See* IDM at 27-28.  As discussed above, Jilin Bright's proposal to use the Global Tar and Pitch report is flawed because that report fails to explain the methodology for obtaining the listed prices, preventing Commerce from "confirm{ing} their validity."  IDM at 28.

Commerce also reasonably declined Jilin Bright's other proposed alternative to value its coal tar input using Russian import data under Russian HTS 2706.00.  *See* Jilin Bright Br. at 23.  "Commerce has a strong preference to value all {factors of production} in a single surrogate country."  IDM at 27 (citing 19 C.F.R. § 351.408(c)(2)).  Commerce's practice is "to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable," which, as discussed above, was not the case for the Malaysian import data under HTS 2706.00.  IDM at 27-28 (citation omitted).  Courts have routinely sustained Commerce's selection of surrogate values in accordance with this preference.  *See, e.g.*, *Jiaxing*, 822 F.3d at 1302 (citing 19 C.F.R. § 351.408(c)(2)) ("find{ing} no error in

Commerce's determination to use Thai import statistics to value HCl, a conclusion in accordance with its administrative preference to appraise surrogate values from a single surrogate country"). Accordingly, Commerce reasonably selected a surrogate value that satisfied its strong preference to value all factors of production from the primary surrogate country of Malaysia.

In sum, the statute does not require Commerce to use "perfect" surrogate value data. *Jiaxing*, 822 F.3d at 1301 (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). To the extent Jilin Bright has identified any flaws with Commerce's chosen surrogate values, the other available options on the record were also "flawed in some way." *Lifestyle Enterprise*, 751 F.3d at 1378. In such cases, Commerce has the discretion to "make a judgment call as to what constitutes the 'best' information." *Id.* Exercising that discretion, Commerce reasonably selected Malaysian import data under HTS 2706.00 to value Jilin Bright's coal tar.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's and plaintiff-intervenors' motions for judgment upon the agency record, sustain Commerce's final determination in all respects, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

OF COUNSEL:                                      /s/ Emma E. Bond
                                                 EMMA E. BOND
RUSLAN KLAFEHN                                   Trial Attorney
Attorney                                         Commercial Litigation Branch
Office of the Chief Counsel                      U.S. Department of Justice
    for Trade Enforcement & Compliance           P.O. Box 480
U.S. Department of Commerce                      Washington, DC 20044
                                                 (202) 305-2034
                                                 Email: emma.e.bond@usdoj.gov

August 28, 2023                                  Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 8,889 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Emma E. Bond

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| _____ ) | |
| JILIN BRIGHT FUTURE CHEMICALS ) | |
| CO., LTD., ) | |
| ) | |
|              Plaintiff, ) | |
|     and ) | |
| ) | |
| NINGXIA GUANGHUA CHERISHMET ) | |
| ACTIVATED CARBON CO., LTD. AND ) | |
| DATONG MUNICIPAL YUNGUANG ) | |
| ACTIVATED CARBON CO., LTD., ) | |
| ) | |
|           Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | Court No. 22-00336 |
| ) | |
| UNITED STATES, ) | |
| ) | |
|           Defendant, ) | |
| ) | |
|     and ) | |
| ) | |
| CALGON CARBON COROFATION AND ) | |
| NORIT AMERICAS, INC., ) | |
| ) | |
|           Defendant-Intervenors. ) | |

## <u>ORDER</u>

       Upon consideration of the motion for judgment upon the agency record filed by plaintiffs, all responses thereto, the administrative record, and other pertinent papers, it is hereby

       ORDERED that the motion is DENIED; and it is further

       ORDERED that the Department of Commerce's final results in this matter are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____, 2023
      New York, NY                                     _____
                                                                   JUDGE