Slip Op. 23-188

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JILIN BRIGHT FUTURE CHEMICALS CO., LTD., <br><br> Plaintiff, <br><br> NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD. AND DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALGON CARBON CORPORATION AND NORIT AMERICAS, INC., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 22-00336 |

## <u>OPINION</u>

[Denying Plaintiff's motion for judgment on the agency record and sustaining the U.S. Department of Commerce's final results in the fourteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: December 21, 2023

Jonathan M. Freed, Robert G. Gosselink, and Doris Di, Trade Pacific PLLC, of Washington, DC, for Plaintiff Jilin Bright Future Chemicals Co., Ltd.

Francis J. Sailer, Jordan C. Kahn, and Kavita Mohan, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiff-Intervenors Ningxia

Guanghua Cherishmet Activated Carbon Co., Ltd. and Datong Municipal Yunguang Activated Carbon Co., Ltd.

Emma E. Bond, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Deputy Director.  Of counsel on the brief was Ruslan Klafehn, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

John M. Herrmann, R. Alan Luberda, and Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors Calgon Carbon Corporation and Norit Americas, Inc.

Barnett, Chief Judge:  Jilin Bright Future Chemicals Co., Ltd. ("Jilin Bright" or "Plaintiff") challenges the final results of the U.S. Department of Commerce ("Commerce" or "the agency") in the fourteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("China") for the period of review ("POR") April 1, 2020, through March 31, 2021.  *See Certain Activated Carbon From the People's Republic of China*, 87 Fed. Reg. 67,671 (Dep't Commerce Nov. 9, 2022) (final results of antidumping duty admin. rev.; and final determination of no shipments; 2020-2021) ("*Final Results*"), ECF No. 28-5, and accompanying Issues and Decision Mem., A-570-904 (Nov. 2, 2022) ("I&D Mem."), ECF No. 28-4.[1]

---

[1] The administrative record for the *Final Results* is contained in a Public Administrative Record ("PR"), ECF No. 28-2, and a Confidential Administrative Record ("CR"), ECF No. 28-3.  Parties filed joint appendices containing record documents cited in their briefs.  Public J.A. ("PJA"), ECF No. 53; Confid. J.A. ("CJA"), ECF No. 52; Public Suppl. J.A. ("Suppl. PJA"), ECF No. 55; Confid. Suppl. J.A. ("Suppl. CJA"), ECF No. 54.

Jilin Bright challenges Commerce's selection of surrogate values for bituminous coal and coal tar pitch.  Confid. Mem. in Supp. of Mot. for J. Upon the Agency R. of Pl. Jilin Bright Future Chemicals Co., Ltd. ("Pl.'s Mem."), ECF No. 37; Pl. Jilin Bright's Reply to Def.'s Resp. to Jilin Bright's Mot. for J. on the Agency R. ("Pl.'s Reply"), ECF No. 50; *see also* Mem. of Law in Supp. of Pl.-Ints.' Mot. for J. on the Agency R., ECF No. 39 (supporting Plaintiff's arguments); Pl.-Ints.' Reply Br., ECF No. 51 (same). Defendant United States ("Defendant" or "the Government") responds in support of Commerce's determination.  Confid. Def.'s Resp. to Pl.'s and Pl.-Ints.' Mots. for J. on the Agency R. ("Def.'s Resp."), ECF No. 43; *see also* Def.-Ints.' Resp. in Opp'n to Pls.' Mot. for J. on the Agency R., ECF No. 45 (supporting the Government's arguments).

For the following reasons, the *Final Results* will be sustained.

## LEGAL BACKGROUND

The United States imposes antidumping duties on foreign-produced goods sold in the United States at less than fair value based upon certain findings by Commerce and the U.S. International Trade Commission.  19 U.S.C. § 1673 (2018).[2]  Commerce compares the "amount by which the normal value exceeds the export price or constructed export price of the subject merchandise" to determine the antidumping duty margin.  *Id.* § 1677(35)(A).

In a nonmarket economy country, like China, Commerce generally determines the normal value by valuing "the factors of production" in a surrogate market economy

---

[2] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and reference to the U.S. Code are to the 2018 edition unless otherwise specified.

country that is, to the extent possible, "at a level of economic development comparable to the nonmarket economy country" and a "significant producer[] of comparable merchandise."  *Id*. § 1677b(c)(4); *see also id*. § 1677b(c)(1).[3]  The agency determines these surrogate values "based on the best available information."  *Id*. § 1677b(c)(1). "Commerce has discretion to determine what constitutes the best available information" because the term is not statutorily defined.  *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015).  The agency generally relies on "surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."  *Id*. (citation omitted); *see also* 19 C.F.R. § 351.408(c)(1) (2021)[4] (stating preference for "publicly available information").  Commerce prefers to use a single surrogate country to value all factors of production.  19 C.F.R. § 351.408(c)(2) (excepting labor).

Commerce may test the reasonableness of the surrogate values available to it using "benchmark" data of "a product whose price roughly correlates with the price of an input assigned a surrogate value."  *Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT 1619, 1622, 949 F. Supp. 2d 1311, 1317 (2013).  Although benchmark

---

[3] The factors of production "include, but are not limited to--(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

[4] This section of the Code of Federal Regulations was in effect during the entire POR, which spanned two calendar years.  The section was updated in October 2023 but remains substantively the same for the purposes of this opinion.  All citations to the Code of Federal Regulations are to the 2021 edition unless otherwise stated.

data need not come from an economically comparable country, the data may be "less

informative the greater the difference" in economic development.  *Id.*

Procedural Background

On June 11, 2021, Commerce initiated the fourteenth administrative review of the

antidumping duty order on certain activated carbon from China.  *Initiation of*

*Antidumping and Countervailing Duty Admin. Revs.*, 86 Fed. Reg. 31,282, 31,289 (Dep't

Commerce June 11, 2021), PR 12, PJA Tab 1.  Commerce selected Jilin Bright and

Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") as the mandatory respondents.

*See* Resp't Selection (Aug. 5, 2021) at 1, 5, CR 17, PR 50, PJA Tab 2.

On May 6, 2022, Commerce preliminarily determined that certain activated

carbon from China was sold at less than fair value in the United States during the POR.

*Certain Activated Carbon From the People's Republic of China*, 87 Fed. Reg. 27,094

(Dep't Commerce May 6, 2022) (prelim. results of antidumping duty admin. rev., prelim.

determination of no shipments; 2020-2021) ("*Prelim. Results*"), PR 304, PJA Tab 15;

Decision Mem. for the Prelim. Results of Antidumping Duty Admin. Rev., A-570-904

(Apr. 29, 2022) ("Prelim. Mem."), PR 299, PJA Tab 13.  Commerce preliminarily

selected Malaysia as the primary surrogate country.  Surrogate Values for the Prelim.

Results (Apr. 29, 2022) at 1, PR 302, PJA Tab 14.  Commerce preliminarily valued

bituminous coal using Malaysian import data under Harmonized Tariff Schedule ("HTS")

2701.12 and coal tar pitch using Malaysian import data under HTS 2706.  *Id.* at 4.  With

respect to its bituminous coal valuation, Commerce also requested that the parties

supply information about the calculation of gross calorific value to aid its determination

as to whether respondents' inputs meet the requirements of bituminous coal under HTS

2701.12.  *See* Prelim. Mem. at 27.

Jilin Bright contested these two preliminary surrogate values.  First, Jilin Bright

disputed the surrogate value for bituminous coal, relying on its testing to argue that,

because of heat value, the coal it used falls under HTS 2701.19, "other coal," rather

than HTS 2701.12, "bituminous coal."  Case Br. (July 8, 2022) ("Jilin Bright Case Br.") at

8–10, CR 220, PR 328, CJA Tab 8.  Second, relying on the Global Coal Tar and Coal

Tar Pitch Report ("UMR Coal Tar Report")[5] as a benchmark, Jilin Bright argued that

Malaysian import data under HTS 2706 for coal tar pitch was anomalous.  *Id.* at 5–6.

Jilin Bright proposed that Commerce should instead use the data from the UMR Coal

Tar Report as the surrogate value because the report contained specific pricing based

on pitch content and product application.  *Id.* at 7.  In the alternative, Jilin Bright

proposed that Commerce use data for Russian imports under HTS 2706 as the

surrogate value for coal tar pitch.  *Id.* at 8.

For the *Final Results*, Commerce selected a formula to convert the heat value of

Jilin Bright's bituminous coal and, based on that conversion, rejected Jilin Bright's

argument that such coal did not meet the standards for HTS 2701.12.  I&D Mem. at 23–

24.  Commerce also continued to value coal tar pitch using the Malaysian import data

---

[5] Throughout the administrative proceedings and in court filings, parties used both
"UMR Coal Tar Report" and "Global Coal Tar and Pitch Report" to refer to the same
document.  *Compare* Pl.'s Mem. at 17, *with* Def.'s Resp. at 24.  The court uses UMR
Coal Tar Report for clarity and consistency.  UMR stands for "Up Market Research" and
is the distributor of the report.  DJAC's First Surrogate Value Cmts (Nov. 15, 2021)
("DJAC 1st Cmts"), Ex. 5Q at 2, PR 115–122, 124, 132–37, PJA Tab 5.

under HTS 2706 because the UMR Coal Tar Report did not include an adequate

explanation of the methodology used to obtain and report the data therein.  *Id.* at 27–28.

Jilin Bright now challenges the *Final Results*, arguing that Commerce's surrogate

value selections for bituminous coal and coal tar pitch are not supported by substantial

evidence.  Pl.'s Mem. at 6, 16.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence . . . means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 217 (1938).  Substantial evidence requires Commerce to "explain the basis for its

decisions," and "the path of Commerce's decision must be reasonably discernable."

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  "The question

here is not whether the information Commerce used was the best available, but rather

whether a reasonable mind could conclude that Commerce chose the best available

information."  *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1300–01

(Fed. Cir. 2016) (citation omitted).

## DISCUSSION

### I.    Bituminous Coal

#### A.  Coal Heat Value Formula Selection

To determine a surrogate value for the coal Jilin Bright used, Commerce considered the heat value of that coal.  HTS 2701.12 includes bituminous coal with a heat value "equal to or greater than 5,833 [kilocalorie/kilogram ('kcal/kg')]."  I&D Mem. at 22 (referencing Note 2 of HTS Chapter 27).  Coal with a heat value of less than 5,833 kcal/kg may be included under HTS 2701.19 (Other Coal).  *See* DJAC 1st Cmts, Ex. 3B (HTS Chapter 27 notes).  Calorific heat value may be based on useful heat value (UHV), net calorific value (NCV), or gross calorific value (GCV).  *See id.* at 7.  Before the agency, the mandatory respondents and the petitioners (Defendant-Intervenors here) disputed the appropriate heat value scale for HTS purposes and the appropriate formula for converting between the reported measurements.  *See* I&D Mem. at 15–20 (summarizing the arguments).  Relevant to this case are two potential formulae for converting UHV or NCV to GCV: (GCV = 1.053*UHV)[6] and (GCV = (UHV + 3645 – 75.4M)/1.466).[7]  Commerce ultimately selected GCV as the relevant measurement for

---

[6] At various points, parties suggest that UHV and NCV are equivalent by referencing a variation of this formula, (GCV = 1.053*NCV).  *Compare* Case Br. of [DJAC] (July 11, 2022) ("DJAC Case Br.") at 11, CR 221–22, PR 329–30, CJA Tab 9 (using NCV), *with* Third Suppl. Section D Resp. (June 15, 2022) ("Jilin Bright Suppl. Resp."), Ex. S3-2, CR 213–15, PR 320, CJA Tab 7 (using UHV).  Plaintiff avers that UHV and NCV "are often used interchangeably" but does not support this statement with any citation.  Pl.'s Mem. at 7.  At the administrative level, Commerce explained that UHV is calculated from a nonlaboratory test sample and NCV is calculated under laboratory conditions.  I&D Mem. 22.  Ultimately, the distinction is not dispositive to the resolution of this case.

[7] In this equation, "M" represents moisture content.

HTS classification purposes and used (GCV = (UHV + 3645 – 75.4M)/1.466) to convert reported heat values to that measurement scale.  I&D Mem. at 23.

Jilin Bright contends that Commerce failed to explain why its selection of the formula (GCV = (UHV + 3645 – 75.4M)/1.466)) yields the most accurate results.  Pl.'s Mem at 16.  Defendant responds that Jilin Bright cannot now challenge the agency's selection because Jilin Bright did not raise this argument before the agency.  Def.'s Resp. at 13 (citing 28 U.S.C. § 2637(d)).  Defendant further argues that even if Jilin Bright may raise this challenge, the selection of the formula is supported by substantial evidence.  *Id.* at 17–22.

The U.S. Court of International Trade "shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d); *see also* 19 C.F.R. § 351.309(c)(2).  Parties need not anticipate issues not raised at the administrative level, but when parties have notice of an issue in dispute, they must raise any arguments to the agency to exhaust their remedies.  *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912–13 (Fed. Cir. 2017).

Here, Commerce identified heat value conversion formula as an open issue in the review.  Commerce noted that the mandatory respondents provided a UHV formula along with moisture, ash, and volatile matter content, while the petitioners submitted evidence that the HTS subheading notes were based on GCV, not UHV.  Prelim. Mem. at 26 & nn.140, 142.  The agency then stated that it "intend[ed] to request clarification and/or additional information from the parties on the [GCV] calculation and how the information in the mandatory respondents' test reports can be used to calculate the

GCV of their bituminous coal." *Id.* at 27.  Commerce then sent Jilin Bright a

supplemental questionnaire, citing a table DJAC had provided that included a calculated

UHV and GCV, and asked Jilin Bright to provide "a similar table summarizing the

moisture, ash, volatile matter content of the bituminous coal procured from each vendor,

and provide the calculated [UHV] and calculated [GCV] for each test report in the same

table."  Jilin Bright Suppl. Resp. at S3-2 (incorporating Commerce's question and

responding to the question).  The table referenced by Commerce relied on the formula

(GCV = 1.053*UHV).  *See id.*; *see also* DJAC's Final Surrogate Value Rebuttal Cmts

and Pre-Prelim. Cmts ("DJAC Final SV Cmts") (Apr. 18, 2022) at 9, CR 189–90, PR

283–84, CJA Tab 5 (providing table Commerce later referenced).

Following the *Preliminary Results*, the mandatory respondents and the

petitioners provided additional information to Commerce on the heat value conversion

formula.  First, Jilin Bright responded to the supplemental questionnaire by providing the

requested table using the same formula that DJAC had used in the sample table.  *See*

Jilin Bright Suppl. Resp., Ex. S3-2; *see also* DJAC Final SV Cmts at 9 (DJAC's table).

Shortly thereafter, the petitioners submitted an article identifying (GCV = (UHV + 3645 –

75.4M)/1.466) as a formula for converting UHV heat values to GCV.  Pet'rs' Submission

of Info. to Rebut, Clarify, or Correct DJAC's June 17, 2022 Suppl. Questionnaire Resp.

(June 24, 2022) ("Pet'rs' Submission"), Ex. 1 at 6, PR 324, PJA Tab 18.  Next, DJAC

and Jilin Bright submitted case briefs.  In its case brief, DJAC continued to argue that

UHV or NCV was the appropriate heat value measurement for HTS purposes but, in the

alternative, identified (GCV = (UHV + 3645 - 75.4M)/1.466) as one of two formulae

Commerce could use to derive GCV from UHV.  DJAC Case Br. at 7, 12.  Meanwhile,

Jilin Bright, citing the table it submitted using (GCV = 1.053*UHV), argued that its coal

did not meet the requirements of HTS 2701.12.  Jilin Bright Case Br. at 8–10.  Jilin

Bright did not make any arguments in support of, or in opposition to, any particular

conversion formula.  *See id.*  The petitioners, for their part, responded to the case briefs

by contesting the formula used by DJAC and Jilin Bright and, like DJAC's alternative

argument, supporting the formula (GCV = (UHV + 3645 - 75.4M)/1.466).  *See* Rebuttal

Br. of Pet'rs (July 22, 2022) at 5–7, CR 226, PR 338–39, Suppl. CJA Tab 2.  In rebuttal,

Jilin Bright again did not address the formula selection.  *See* Rebuttal Br. (July 22,

2022), PR 335, Suppl. PJA Tab 1 (presenting arguments on foreign inland freight

surrogate value and surrogate financial ratios).  Ultimately, Commerce relied on (GCV =

(UHV + 3645 - 75.4M)/1.466) as the conversion formula.  I&D Mem. at 23.

The court must first consider whether Jilin Bright exhausted its arguments before

the agency.  Jilin Bright contends that exhaustion does not apply because it "did not

have a full and fair opportunity to challenge Commerce's chosen formula at the

administrative level."  Pl.'s Reply at 2.  Jilin Bright avers that Commerce, in its

supplemental questionnaire, "instruct[ed] Plaintiff to use the formula GCV =

1.053*UHV."  *Id.* at 3 (emphasis omitted).  Thus, Jilin Bright argues, it was "not required

to predict" Commerce's decision to accept a formula first proposed by petitioners after

the preliminary results.  *Id.* at 4–5 (discussing *Qingdao Taifa Grp. Co. v. United States*,

33 CIT 1090, 637 F. Supp. 2d 1231 (2009), and *Jacobi Carbons AB v. United States*, 38

CIT 932, 992 F. Supp. 2d 1360 (2014), *aff'd*, 619 F. App'x 992 (Fed. Cir. 2015)).

Contrary to Jilin Bright's argument, this case fits squarely into the classic administrative exhaustion paradigm.  Jilin Bright had notice that calorific value conversion was an open issue.  Jilin Bright concedes that, "at the time of Commerce's preliminary results, Commerce did not make a determination regarding the utilization of UHV or GCV."  Pl.'s Reply at 3.  More than not deciding whether to use UHV or GCV, Commerce solicited information "on the [GCV] calculation" and how available information could "be used to calculate the GCV of [the mandatory respondents'] bituminous coal input."  Prelim. Mem. at 27.  As discussed above, the petitioners and DJAC addressed the alternative conversion formulae in their submissions to Commerce.  Indeed, the petitioners and DJAC addressed, and DJAC endorsed, the formula that Commerce ultimately adopted.  Based on that record, Jilin Bright knew or should have known that this issue was undecided, yet it failed to raise any arguments before the agency, as it was required to do.  *See* 28 U.S.C. § 2637(d); 19 C.F.R. § 351.309(c)(2).

Jilin Bright's attempted reliance on Commerce's reference to DJAC's table in its supplemental questionnaire is misplaced.  In that questionnaire, Commerce did not "instruct[]" Jilin Bright to use any specific formula, as Jilin Bright avers in its reply.  *See* Pl.'s Reply at 3.  Rather, Commerce instructed Plaintiff to provide the calculated GCV in a table and cited as an example DJAC's table that used the formula.  *See* Jilin Bright Suppl. Resp. at S3-2.  This questionnaire was issued after Commerce explicitly indicated that it needed further input on the appropriate formula to use in its preliminary

results.  Prelim. Mem. at 27.  Nothing in the questionnaire suggests that Commerce had

determined its preferred formula.

Jilin Bright was required to raise arguments related to the heat value conversion

formula to the agency in the first instance, and it is clear from the record that Jilin Bright,

as much as the petitioners and DJAC, had notice of this issue.  Because Jilin Bright

failed to contest the conversion formula before Commerce, the court declines to review

it now.[8]

### B.  Benchmark Data

Jilin Bright next revives an argument DJAC presented to Commerce regarding

benchmark data for bituminous coal valuation.[9]  To ensure the reasonableness of

surrogate values, Commerce may review comparative "benchmark" data to the extent

that data is useful.  *Blue Field*, 37 CIT at 1622, 949 F. Supp. 2d at 1317.  At the

---

[8] Jilin Bright also objects to the assumption of a five percent moisture content in the
GCV formula and argues that because of that flawed assumption the agency should
have used an alternative formula, namely (GCV = 1.053*UHV).  Pl.'s Mem. at 13–15.
As with any general argument about the conversion formula selected, Jilin Bright failed
to challenge the five percent moisture assumption.  *Cf.* Rebuttal Br. of Pet'rs at 17
(raising the five percent inherent moisture).  In presenting this argument to the court,
Jilin Bright included a table purportedly adapted from the administrative record and to
which the Government objected.  *See* Pl.'s Reply at 5–6 (summarizing parties'
positions).  Because the table goes to the substantive issue of the formula selection, for
which Jilin Bright failed to exhaust its administrative remedies, the court need not
address the Government's objection.

[9] Although Jilin Bright did not present this argument to Commerce, DJAC did.  As a
result, Commerce considered the issue, and this court may review Jilin Bright's
argument now.  *See Valley Fresh Seafood, Inc. v. United States*, 31 CIT 1989, 1995
(2007) ("The court may excuse a party's failure to raise an argument before the
administrative agency if, as occurred in this case, the agency in fact considered the
issue.").

administrative level, DJAC proposed benchmark data from a Chinese coal expert and

the U.S. Energy Information Administration purporting to show that the price of coking

coal is generally higher than the price of non-coking coal.  DJAC Case Br. at 17.  In

contrast, the average unit value of Malaysian imports under HTS 2701.12.9000 (non-

coking coal) was double that of HTS 2701.12.1000 (coking coal), and DJAC argued that

this disaggregated information at the ten-digit HTS level contributed to the unreliability

of the Malaysian import data at the six-digit HTS level for HTS 2701.12.  *Id.*  For the

*Final Results*, Commerce explained that it rejected DJAC's argument because

"appropriate benchmark data" included "historical import data for the potential surrogate

countries" and "data from the [HTS] category for the primary surrogate country over

multiple years," and "the record lack[ed] sufficient benchmark data" to support DJAC's

argument.  I&D Mem. at 21 & n.154.

   Jilin Bright challenges this decision, arguing that, based on global and U.S.

prices, the Malaysian import data under HTS 2701.12 is not product-specific and is

anomalous.  Pl.'s Mem. at 9–11.  Like DJAC did before the agency, Jilin Bright avers

that coking and non-coking coal within the Malaysian HTS 2701.12 has the opposite

price correlation as world and U.S. prices for the same.  *Id.* at 9–10 (discussing DJAC's

submissions to the agency).  Jilin Bright contends that Commerce must consider all the

evidence, even that which "fairly detracts" from its conclusion, such as this proposed

benchmark data of global and U.S. prices.  *Id.* at 10 (quoting *Nippon Steel Corp. v.*

*United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006)).  Jilin Bright argues that Malaysian

HTS 2701.12 is anomalous based on the proposed benchmark data and, therefore,

Commerce should have valued bituminous coal under Malaysian HTS 2701.19.  *Id.* at

11.  Defendant counters that Commerce reasonably determined that the disaggregated

data for coking and non-coking coal did not constitute an appropriate benchmark for

determining whether the aggregated data for bituminous coal was aberrant.  Def.'s

Resp. at 23.

    Contrary to Jilin Bright's assertion, Commerce did consider the record as a whole

when it addressed DJAC's (now Jilin Bright's) argument and declined to reject the

Malaysian data based on the argument about the relationship between coking and non-

coking coal prices.  *See* I&D Mem. at 21.  Commerce explained that "appropriate

benchmark data" is "historical import data for the potential surrogate countries" or data

from "the same [HTS] category for the primary surrogate country over multiple years."

*Id.*  From the explanation provided, the court understands Commerce's preference for

relying on benchmark data from economically comparable countries.  Thus, the U.S.

and global prices that Jilin Bright seeks to rely on are less informative than the data

identified by Commerce given the economic disparities in the level of development

between the United States and Malaysia.  *Cf. Calgon Carbon Corp. v. United States*, 40

CIT __, __, 190 F. Supp. 3d 1224, 1234 (2016) (concluding that Commerce "acted

reasonably" in not using U.S. data as a benchmark because of the economic disparity

between levels of development).  Likewise, global prices, encompassing data from

countries of various levels of economic development, are also less informative.  *See*

*Blue Field*, 37 CIT at 1622, 949 F. Supp. 2d at 1317 ("Benchmarks, of course, become

less informative the greater the difference in the levels of development of the countries

from which the data derive.").  Finally, the supposed benchmark data was not for the same six-digit HTS category.  Rather, Jilin Bright (and DJAC) relied on data from ten-digit subcategories (2701.12.1000 and 2701.12.9000).  *See* Pl.'s Mem. at 9 (citing DJAC 1st Cmts, Ex. 3(A)(i)).  At most, the proposed data suggests inconsistencies between Malaysian imports under HTS 2701.12.1000 and 2701.12.9000; it does not explain how those figures would render Malaysian import data under HTS 2701.12 aberrant.  Even if Jilin Bright identified an anomalous relationship between the two ten-digit subheadings, Jilin Bright did not identify any aberration in the six-digit subheading.  Neither respondent proffered any data to suggest that Malaysian import data under HTS 2701.12, the category upon which Commerce relied, was aberrant.

Jilin Bright's further argument, made for the first time in its reply brief, fares no better.  Therein, Plaintiff claims that the disaggregated data for Turkey and Russia support the notion that coking coal is priced higher than non-coking coal.  *See* Pl.'s Reply at 8–9 (citing DJAC's 1st Cmts, Ex. 3(A)(i) at 7–8).  Arguments raised for the first time in reply are generally waived.  *Novosteel SA v. United States*, 284 F.3d 1261, 1273–74 (Fed. Cir. 2002).  Waiver aside, the referenced data is not for the HTS category selected by Commerce and, as Commerce noted for its *Preliminary Results*, although the agency considered Turkey and Russia as potential surrogate countries, Malaysia was the only potential surrogate country that was a significant producer of comparable merchandise.  *See* Prelim. Mem. at 14 (explaining selection of Malaysia); *see also* Reqs. for Econ. Dev., Surrogate Country and Surrogate Value Cmts and Info.

(Oct. 18, 2021) at Attach. 1, PR 96, PJA Tab 3 (listing Russia and Turkey as possible

surrogate countries).

As stated previously, Commerce will compare potential surrogate values against

appropriate benchmark data for "a product whose price roughly correlates with the price

of an input assigned a surrogate value." *Blue Field*, 37 CIT at 1622, 949 F. Supp. 2d at

1317.  Additionally, when using import prices as a surrogate value, Commerce will

exclude from its surrogate value calculation imports from nonmarket economy countries

and from countries providing export subsidies or found to have engaged in dumping.

*See, e.g.*, 19 U.S.C. § 1677b(c)(5); *Fresh Garlic Prods. Ass'n v. United States*, 39 CIT

__, __, 121 F. Supp. 3d 1313, 1318 (2015).  Plaintiff has failed to convince the court

that it should impose an additional burden on the agency to disaggregate its selected

surrogate value data and test it against data from noncomparable or nonproducing

countries.

## II.    Valuation of Coal Tar Pitch[10]

Jilin Bright contests Commerce's determination to use Malaysian import data

under HTS 2706 to value its coal tar pitch, relying, as it did before the agency, on the

UMR Coal Tar Report.  Pl.'s Mem. at 17–23.  Jilin Bright primarily contends that the

---

[10] Jilin Bright uses "coal tar" and "coal tar pitch" interchangeably.  *Compare* Pl.'s Mem. at 16 (introducing its challenge to Commerce's surrogate value for "coal tar pitch"), *with id.* (noting Jilin Bright had advocated for the UMR Coal Tar Report to value "coal tar"). The record indicates that coal tar has 50–65 percent pitch, partially distilled tar/pitch has 65–99 percent pitch, and pure pitch has 100 percent pitch.  *Id.* at 17 (citing the UMR Coal Tar Report).  Based on pitch content, Jilin Bright's coal tar pitch corresponds to coal tar and partially distilled tar/pitch, but not pure pitch.  *Id.*  The court uses "coal tar pitch" for consistency.

UMR Coal Tar Report shows that Malaysian import data under HTS 2706 is anomalous and should not be used as a surrogate value. *Id.* at 19–23. First, Jilin Bright relies on the Malaysian import average value unit being seven times higher than UMR Coal Tar Report average prices. *Id.* at 22. Second, Jilin Bright points to the UMR Coal Tar Report showing that pitch, which is more processed than coal tar or partially distilled tar/pitch, has a "significantly higher" value than coal tar, in contrast to the inverse price relationship for the Malaysian import data. *Id.* Jilin Bright also argues that the UMR Coal Tar Report is more specific than Malaysian import data under HTS 2706 because it differentiates by pitch content and by application (namely chemical applications). *Id.* at 17. Commerce declined to rely on the UMR Coal Tar Report, both as benchmark data to establish aberrancy and as an alternative surrogate value, because the report failed to adequately explain the methodology for its data collection and reporting. *See* I&D Mem. at 28. Plaintiff argues that Commerce's decision was unsupported by substantial evidence because the UMR Coal Tar Report has a methodology section. Pl.'s Mem at 18.

Commerce reasonably declined to rely on the UMR Coal Tar Report as either benchmark data or as an alternative surrogate value. Commerce explained that the report lacked sufficient information and explanation for Commerce to confirm the validity of the data contained therein or to confirm the data was representative of a broad market average and free from taxes and duties. I&D Mem. at 28. Commerce acted reasonably in determining that unverifiable data is not helpful in demonstrating the aberrancy of a surrogate value. *See Blue Field*, 37 CIT at 1622, 949 F. Supp. 2d at

1317 ("In sum, Commerce may use benchmark data if these data prove helpful in determining whether a surrogate value is aberrational . . . ."). Likewise, given Commerce's stated preference for surrogate values that are representative of a broad market average and are tax- and duty-exclusive, I&D Mem. at 28; *see also Downhole Pipe*, 776 F.3d at 1375, the agency's decision to reject the UMR Coal Tar Report as a surrogate value when the agency could not determine these factors was also reasonable.

Jilin Bright's arguments to the contrary are unpersuasive. Plaintiff avers that the UMR Coal Tar Report included a methodology section, and therefore Commerce's decision was unsupported by substantial evidence. Pl.'s Mem. at 18. However, the inclusion of a section labeled "Research Methodology" is of no consequence if it does not adequately describe the methodology such that Commerce may verify the data or confirm its representativeness and determine the inclusion of taxes or duties. *See* DJAC's 1st Cmts, Ex. 5Q at 12–14 (methodology section). The UMR Coal Tar Report's recitation of generic primary and secondary sources that may or may not have been utilized and reference to "a variety of methods," *id.*, are not descriptions of the methodology adequate to address Commerce's concerns. Thus, Jilin Bright has not met its burden to identify record evidence that would enable Commerce to confirm the relevance of the UMR Coal Tar Report data. *QVD Food Co. v. United States*, 658 F.3d

1318, 1324 (Fed. Cir. 2011) (explaining that the interested party bears the burden to create an adequate record).[11]

Plaintiff argues that even if Commerce reasonably declined to rely on the UMR Coal Tar Report, Commerce should have used Russian import data under HTS 2706 as the surrogate value for coal tar pitch.  Pl.'s Mem. at 23.  However, the only data that Jilin Bright cites to call into question the Malaysian import data is the UMR Coal Tar Report. Jilin Bright asserts that pitch should have a higher price than tar (or partially distilled tar/pitch) because it is more processed.  *See id.* at 20 (citing the UMR Coal Tar Report). The court is not persuaded by that assertion.  As Commerce pointed out, "there may be factors involved with pricing apart from the cost of manufacturing that impact a product's value."  I&D Mem. at 27; *see also Carbon Activated Tianjin Co. v. United States*, 45 CIT __, __, 650 F. Supp. 3d 1354, 1368 (2023) (discussing and rejecting a similar argument).  Moreover, Commerce prefers surrogate values from a single surrogate country, 19 C.F.R. § 351.408(c)(2), and Jilin Bright provided no reason (beyond the rejected UMR Coal Tar Report) for Commerce to abandon that preference.

---

[11] Jilin Bright compares the UMR Coal Tar Report to the report that the petitioners submitted regarding heat value conversion formula for bituminous coal.  Plaintiff argues that Commerce relied on that conversion formula despite petitioners' source having "far less explanation regarding its methods and sources, credentials of its author, or its public-availability."  Pl.'s Mem. at 18.  Plaintiff's comparison is inapposite.  Commerce used the petitioners' report as a source of a conversion formula to understand the relationship between two different measures of heat value – not as a source of heat value itself, or a surrogate value.

Commerce reasonably determined to rely on Malaysian import data under HTS 2706 to value coal tar pitch, and its decision to reject Plaintiff's arguments against such reliance was based on substantial evidence.

**CONCLUSION**

For the reasons discussed above, the court will sustain Commerce's *Final Results*.  Judgment will enter accordingly.


                                                    /s/      Mark A. Barnett
                                                    Mark A. Barnett, Chief Judge

Dated: December 21, 2023
        New York, New York